OCTOBER TERM, 2012 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* WINDSOR, EXECUTOR OF THE ESTATE OF SPYER, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 12–307.   Argued March 27, 2013—Decided June 26, 2013

The State of New York recognizes the marriage of New York residents Edith Windsor and Thea Spyer, who wed in Ontario, Canada, in 2007. When Spyer died in 2009, she left her entire estate to Windsor. Windsor sought to claim the federal estate tax exemption for surviving spouses, but was barred from doing so by §3 of the federal Defense of Marriage Act (DOMA), which amended the Dictionary Act—a law providing rules of construction for over 1,000 federal laws and the whole realm of federal regulations—to define "marriage" and "spouse" as excluding same-sex partners. Windsor paid $363,053 in estate taxes and sought a refund, which the Internal Revenue Service denied. Windsor brought this refund suit, contending that DOMA violates the principles of equal protection incorporated in the Fifth Amendment. While the suit was pending, the Attorney General notified the Speaker of the House of Representatives that the Department of Justice would no longer defend §3's constitutionality. In response, the Bipartisan Legal Advisory Group (BLAG) of the House of Representatives voted to intervene in the litigation to defend §3's constitutionality. The District Court permitted the intervention. On the merits, the court ruled against the United States, finding §3 unconstitutional and ordering the Treasury to refund Windsor's tax with interest. The Second Circuit affirmed. The United States has not complied with the judgment.

*Held*:

1. This Court has jurisdiction to consider the merits of the case. This case clearly presented a concrete disagreement between opposing parties that was suitable for judicial resolution in the District Court, but the Executive's decision not to defend §3's constitutionali-

2                    UNITED STATES *v.* WINDSOR

ty in court while continuing to deny refunds and assess deficiencies
introduces a complication.  Given the Government's concession, *ami-
cus* contends, once the District Court ordered the refund, the case
should have ended and the appeal been dismissed.  But this argu-
ment elides the distinction between Article III's jurisdictional re-
quirements and the prudential limits on its exercise, which are "es-
sentially matters of judicial self-governance."  *Warth* v. *Seldin*, 422
U. S. 490, 500.  Here, the United States retains a stake sufficient to
support Article III jurisdiction on appeal and in this Court.  The re-
fund it was ordered to pay Windsor is "a real and immediate econom-
ic injury," *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S.
587, 599, even if the Executive disagrees with §3 of DOMA.  Wind-
sor's ongoing claim for funds that the United States refuses to pay
thus establishes a controversy sufficient for Article III jurisdiction.
Cf. *INS* v. *Chadha*, 462 U. S. 919.

    Prudential considerations, however, demand that there be "con-
crete adverseness which sharpens the presentation of issues upon
which the court so largely depends for illumination of difficult consti-
tutional questions."  *Baker* v. *Carr*, 369 U. S. 186, 204.  Unlike Article
III requirements—which must be satisfied by the parties before judi-
cial consideration is appropriate—prudential factors that counsel
against hearing this case are subject to "countervailing considera-
tions [that] may outweigh the concerns underlying the usual reluc-
tance to exert judicial power."  *Warth*, *supra*, at 500–501.  One such
consideration is the extent to which adversarial presentation of the
issues is ensured by the participation of *amici curiae* prepared to de-
fend with vigor the legislative act's constitutionality.  See *Chadha,
supra,* at 940.  Here, BLAG's substantial adversarial argument for
§3's constitutionality satisfies prudential concerns that otherwise
might counsel against hearing an appeal from a decision with which
the principal parties agree.  This conclusion does not mean that it is
appropriate for the Executive as a routine exercise to challenge stat-
utes in court instead of making the case to Congress for amendment
or repeal.  But this case is not routine, and BLAG's capable defense
ensures that the prudential issues do not cloud the merits question,
which is of immediate importance to the Federal Government and to
hundreds of thousands of persons.  Pp. 5–13.

    2. DOMA is unconstitutional as a deprivation of the equal liberty of
persons that is protected by the Fifth Amendment.  Pp. 13–26.

    (a) By history and tradition the definition and regulation of mar-
riage has been treated as being within the authority and realm of the
separate States.  Congress has enacted discrete statutes to regulate
the meaning of marriage in order to further federal policy, but
DOMA, with a directive applicable to over 1,000 federal statues and

Cite as: 570 U. S. ____ (2013)                    3

Syllabus

the whole realm of federal regulations, has a far greater reach. Its operation is also directed to a class of persons that the laws of New York, and of 11 other States, have sought to protect. Assessing the validity of that intervention requires discussing the historical and traditional extent of state power and authority over marriage.

Subject to certain constitutional guarantees, see, *e.g.*, *Loving* v. *Virginia*, 388 U. S. 1, "regulation of domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States," *Sosna* v. *Iowa*, 419 U. S. 393, 404. The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for "when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States," *Ohio ex rel. Popovici* v. *Agler*, 280 U. S. 379, 383–384. Marriage laws may vary from State to State, but they are consistent within each State.

DOMA rejects this long-established precept. The State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import. But the Federal Government uses the state-defined class for the opposite purpose—to impose restrictions and disabilities. The question is whether the resulting injury and indignity is a deprivation of an essential part of the liberty protected by the Fifth Amendment, since what New York treats as alike the federal law deems unlike by a law designed to injure the same class the State seeks to protect. New York's actions were a proper exercise of its sovereign authority. They reflect both the community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality. Pp. 13–20.

(b) By seeking to injure the very class New York seeks to protect, DOMA violates basic due process and equal protection principles applicable to the Federal Government. The Constitution's guarantee of equality "must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot" justify disparate treatment of that group. *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 534–535. DOMA cannot survive under these principles. Its unusual deviation from the tradition of recognizing and accepting state definitions of marriage operates to deprive same-sex couples of the benefits and responsibilities that come with federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of a class recognized and protected by state law. DOMA's avowed purpose and practical effect are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority

4               UNITED STATES *v.* WINDSOR

Syllabus

of the States.

DOMA's history of enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute. It was its essence. BLAG's arguments are just as candid about the congressional purpose. DOMA's operation in practice confirms this purpose. It frustrates New York's objective of eliminating inequality by writing inequality into the entire United States Code.

DOMA's principal effect is to identify and make unequal a subset of state-sanctioned marriages. It contrives to deprive some couples married under the laws of their State, but not others, of both rights and responsibilities, creating two contradictory marriage regimes within the same State. It also forces same-sex couples to live as married for the purpose of state law but unmarried for the purpose of federal law, thus diminishing the stability and predictability of basic personal relations the State has found it proper to acknowledge and protect. Pp. 20–26.

699 F. 3d 169, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, and in which ROBERTS, C. J., joined as to Part I. ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined as to Parts II and III.

Cite as: 570 U. S. ____ (2013)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–307

UNITED STATES, PETITIONER *v.* EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS EXECUTOR OF THE ESTATE OF THEA CLARA SPYER, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

Two women then resident in New York were married in a lawful ceremony in Ontario, Canada, in 2007. Edith Windsor and Thea Spyer returned to their home in New York City. When Spyer died in 2009, she left her entire estate to Windsor. Windsor sought to claim the estate tax exemption for surviving spouses. She was barred from doing so, however, by a federal law, the Defense of Marriage Act, which excludes a same-sex partner from the definition of "spouse" as that term is used in federal statutes. Windsor paid the taxes but filed suit to challenge the constitutionality of this provision. The United States District Court and the Court of Appeals ruled that this portion of the statute is unconstitutional and ordered the United States to pay Windsor a refund. This Court granted certiorari and now affirms the judgment in Windsor's favor.

I

In 1996, as some States were beginning to consider the concept of same-sex marriage, see, *e.g., Baehr* v. *Lewin*, 74

Opinion of the Court

Haw. 530, 852 P. 2d 44 (1993), and before any State had acted to permit it, Congress enacted the Defense of Marriage Act (DOMA), 110 Stat. 2419. DOMA contains two operative sections: Section 2, which has not been challenged here, allows States to refuse to recognize same-sex marriages performed under the laws of other States. See 28 U. S. C. §1738C.

Section 3 is at issue here. It amends the Dictionary Act in Title 1, §7, of the United States Code to provide a federal definition of "marriage" and "spouse." Section 3 of DOMA provides as follows:

> "In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." 1 U. S. C. §7.

The definitional provision does not by its terms forbid States from enacting laws permitting same-sex marriages or civil unions or providing state benefits to residents in that status. The enactment's comprehensive definition of marriage for purposes of all federal statutes and other regulations or directives covered by its terms, however, does control over 1,000 federal laws in which marital or spousal status is addressed as a matter of federal law. See GAO, D. Shah, Defense of Marriage Act: Update to Prior Report 1 (GAO–04–353R, 2004).

Edith Windsor and Thea Spyer met in New York City in 1963 and began a long-term relationship. Windsor and Spyer registered as domestic partners when New York City gave that right to same-sex couples in 1993. Concerned about Spyer's health, the couple made the 2007 trip to Canada for their marriage, but they continued to reside

in New York City. The State of New York deems their
Ontario marriage to be a valid one. See 699 F. 3d 169,
177–178 (CA2 2012).

Spyer died in February 2009, and left her entire estate
to Windsor. Because DOMA denies federal recognition to
same-sex spouses, Windsor did not qualify for the marital
exemption from the federal estate tax, which excludes
from taxation "any interest in property which passes or
has passed from the decedent to his surviving spouse." 26
U. S. C. §2056(a). Windsor paid $363,053 in estate taxes
and sought a refund. The Internal Revenue Service de-
nied the refund, concluding that, under DOMA, Windsor
was not a "surviving spouse." Windsor commenced
this refund suit in the United States District Court for
the Southern District of New York. She contended
that DOMA violates the guarantee of equal protection,
as applied to the Federal Government through the Fifth
Amendment.

While the tax refund suit was pending, the Attorney
General of the United States notified the Speaker of the
House of Representatives, pursuant to 28 U. S. C. §530D,
that the Department of Justice would no longer defend the
constitutionality of DOMA's §3. Noting that "the Depart-
ment has previously defended DOMA against . . . chal-
lenges involving legally married same-sex couples," App.
184, the Attorney General informed Congress that "the
President has concluded that given a number of factors,
including a documented history of discrimination, classifi-
cations based on sexual orientation should be subject to
a heightened standard of scrutiny." *Id.,* at 191. The De-
partment of Justice has submitted many §530D letters
over the years refusing to defend laws it deems unconsti-
tutional, when, for instance, a federal court has rejected
the Government's defense of a statute and has issued a
judgment against it. This case is unusual, however, be-
cause the §530D letter was not preceded by an adverse

4                 UNITED STATES *v.* WINDSOR

Opinion of the Court

judgment.  The letter instead reflected the Executive's own conclusion, relying on a definition still being debated and considered in the courts, that heightened equal protection scrutiny should apply to laws that classify on the basis of sexual orientation.

Although "the President . . . instructed the Department not to defend the statute in *Windsor*," he also decided "that Section 3 will continue to be enforced by the Executive Branch" and that the United States had an "interest in providing Congress a full and fair opportunity to participate in the litigation of those cases." *Id.,* at 191–193.  The stated rationale for this dual-track procedure (determination of unconstitutionality coupled with ongoing enforcement) was to "recogniz[e] the judiciary as the final arbiter of the constitutional claims raised." *Id.,* at 192.

In response to the notice from the Attorney General, the Bipartisan Legal Advisory Group (BLAG) of the House of Representatives voted to intervene in the litigation to defend the constitutionality of §3 of DOMA.  The Department of Justice did not oppose limited intervention by BLAG.  The District Court denied BLAG's motion to enter the suit as of right, on the rationale that the United States already was represented by the Department of Justice.  The District Court, however, did grant intervention by BLAG as an interested party.  See Fed. Rule Civ. Proc. 24(a)(2).

On the merits of the tax refund suit, the District Court ruled against the United States.  It held that §3 of DOMA is unconstitutional and ordered the Treasury to refund the tax with interest.  Both the Justice Department and BLAG filed notices of appeal, and the Solicitor General filed a petition for certiorari before judgment.  Before this Court acted on the petition, the Court of Appeals for the Second Circuit affirmed the District Court's judgment.  It applied heightened scrutiny to classifications based on sexual orientation, as both the Department and Windsor had

urged.  The United States has not complied with the judgment.  Windsor has not received her refund, and the Executive Branch continues to enforce §3 of DOMA.

In granting certiorari on the question of the constitutionality of §3 of DOMA, the Court requested argument on two additional questions: whether the United States' agreement with Windsor's legal position precludes further review and whether BLAG has standing to appeal the case.  All parties agree that the Court has jurisdiction to decide this case; and, with the case in that framework, the Court appointed Professor Vicki Jackson as *amicus curiae* to argue the position that the Court lacks jurisdiction to hear the dispute.  568 U. S. ___ (2012).  She has ably discharged her duties.

In an unrelated case, the United States Court of Appeals for the First Circuit has also held §3 of DOMA to be unconstitutional.  A petition for certiorari has been filed in that case.  Pet. for Cert. in *Bipartisan Legal Advisory Group* v. *Gill*, O. T. 2012, No. 12–13.

II

It is appropriate to begin by addressing whether either the Government or BLAG, or both of them, were entitled to appeal to the Court of Appeals and later to seek certiorari and appear as parties here.

There is no dispute that when this case was in the District Court it presented a concrete disagreement between opposing parties, a dispute suitable for judicial resolution.  "[A] taxpayer has standing to challenge the collection of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer."  *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587, 599 (2007) (plurality opinion) (emphasis deleted).  Windsor suffered a redressable injury when she was required to pay estate taxes from which, in her view, she was exempt

but for the alleged invalidity of §3 of DOMA.

The decision of the Executive not to defend the constitu-
tionality of §3 in court while continuing to deny refunds
and to assess deficiencies does introduce a complication.
Even though the Executive's current position was an-
nounced before the District Court entered its judgment,
the Government's agreement with Windsor's position would
not have deprived the District Court of jurisdiction to
entertain and resolve the refund suit; for her injury (fail-
ure to obtain a refund allegedly required by law) was
concrete, persisting, and unredressed.  The Government's
position—agreeing with Windsor's legal contention but
refusing to give it effect—meant that there was a justicia-
ble controversy between the parties, despite what the
claimant would find to be an inconsistency in that stance.
Windsor, the Government, BLAG, and the *amicus* appear
to agree upon that point.  The disagreement is over the
standing of the parties, or aspiring parties, to take an
appeal in the Court of Appeals and to appear as parties in
further proceedings in this Court.

The *amicus'* position is that, given the Government's
concession that §3 is unconstitutional, once the District
Court ordered the refund the case should have ended;
and the *amicus* argues the Court of Appeals should have
dismissed the appeal.  The *amicus* submits that once
the President agreed with Windsor's legal position and the
District Court issued its judgment, the parties were no
longer adverse.  From this standpoint the United States
was a prevailing party below, just as Windsor was.  Ac-
cordingly, the *amicus* reasons, it is inappropriate for this
Court to grant certiorari and proceed to rule on the merits;
for the United States seeks no redress from the judgment
entered against it.

This position, however, elides the distinction between
two principles: the jurisdictional requirements of Article
III and the prudential limits on its exercise.  See *Warth* v.

*Seldin,* 422 U. S. 490, 498 (1975). The latter are "essentially matters of judicial self-governance." *Id.,* at 500. The Court has kept these two strands separate: "Article III standing, which enforces the Constitution's case-or-controversy requirement, see *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 559–562 (1992); and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction,' *Allen* [v. *Wright,*] 468 U. S. [737,] 751 [(1984)]." *Elk Grove Unified School Dist.* v. *Newdow,* 542 U. S. 1, 11–12 (2004).

The requirements of Article III standing are familiar:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural or hypothetical."' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan, supra,* at 560–561 (footnote and citations omitted).

Rules of prudential standing, by contrast, are more flexible "rule[s] . . . of federal appellate practice," *Deposit Guaranty Nat. Bank* v. *Roper,* 445 U. S. 326, 333 (1980), designed to protect the courts from "decid[ing] abstract questions of wide public significance even [when] other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth, supra,* at 500.

In this case the United States retains a stake sufficient to support Article III jurisdiction on appeal and in pro-

ceedings before this Court. The judgment in question orders the United States to pay Windsor the refund she seeks. An order directing the Treasury to pay money is "a real and immediate economic injury," *Hein*, 551 U. S., at 599, indeed as real and immediate as an order directing an individual to pay a tax. That the Executive may welcome this order to pay the refund if it is accompanied by the constitutional ruling it wants does not eliminate the injury to the national Treasury if payment is made, or to the taxpayer if it is not. The judgment orders the United States to pay money that it would not disburse but for the court's order. The Government of the United States has a valid legal argument that it is injured even if the Executive disagrees with §3 of DOMA, which results in Windsor's liability for the tax. Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction. It would be a different case if the Executive had taken the further step of paying Windsor the refund to which she was entitled under the District Court's ruling.

This Court confronted a comparable case in *INS* v. *Chadha*, 462 U. S. 919 (1983). A statute by its terms allowed one House of Congress to order the Immigration and Naturalization Service (INS) to deport the respondent Chadha. There, as here, the Executive determined that the statute was unconstitutional, and "the INS presented the Executive's views on the constitutionality of the House action to the Court of Appeals." *Id.,* at 930. The INS, however, continued to abide by the statute, and "the INS brief to the Court of Appeals did not alter the agency's decision to comply with the House action ordering deportation of Chadha." *Ibid.* This Court held "that the INS was sufficiently aggrieved by the Court of Appeals decision prohibiting it from taking action it would otherwise take," *ibid.,* regardless of whether the agency welcomed the judgment. The necessity of a "case or controversy" to

satisfy Article III was defined as a requirement that the
Court's "'decision will have real meaning: if we rule for
Chadha, he will not be deported; if we uphold [the stat-
ute], the INS will execute its order and deport him.'" *Id.,*
at 939–940 (quoting *Chadha* v. *INS*, 634 F. 2d 408, 419
(CA9 1980)). This conclusion was not dictum. It was a
necessary predicate to the Court's holding that "prior to
Congress' intervention, there was adequate Art. III ad-
verseness." 462 U. S*.,* at 939. The holdings of cases are
instructive, and the words of *Chadha* make clear its hold-
ing that the refusal of the Executive to provide the relief
sought suffices to preserve a justiciable dispute as re-
quired by Article III. In short, even where "the Govern-
ment largely agree[s] with the opposing party on the
merits of the controversy," there is sufficient adverseness
and an "adequate basis for jurisdiction in the fact that
the Government intended to enforce the challenged law
against that party." *Id.*, at 940, n. 12.

It is true that "[a] party who receives all that he has
sought generally is not aggrieved by the judgment afford-
ing the relief and cannot appeal from it." *Roper*, *supra,* at
333, see also *Camreta* v. *Greene*, 563 U. S. ___, ___ (2011)
(slip op., at 8) ("As a matter of practice and prudence, we
have generally declined to consider cases at the request of
a prevailing party, even when the Constitution allowed us
to do so"). But this rule "does not have its source in the
jurisdictional limitations of Art. III. In an appropriate
case, appeal may be permitted . . . at the behest of the
party who has prevailed on the merits, so long as that
party retains a stake in the appeal satisfying the require-
ments of Art. III." *Roper*, *supra,* at 333–334.

While these principles suffice to show that this case
presents a justiciable controversy under Article III, the
prudential problems inherent in the Executive's unusual
position require some further discussion. The Executive's
agreement with Windsor's legal argument raises the risk

that instead of a "'real, earnest and vital controversy,'"
the Court faces a "friendly, non-adversary, proceeding . . .
[in which] 'a party beaten in the legislature [seeks to]
transfer to the courts an inquiry as to the constitutionality
of the legislative act.'" *Ashwander* v. *TVA*, 297 U. S.
288, 346 (1936) (Brandeis, J., concurring) (quoting *Chicago
& Grand Trunk R. Co.* v. *Wellman*, 143 U. S. 339,
345 (1892)). Even when Article III permits the exercise
of federal jurisdiction, prudential considerations demand
that the Court insist upon "that concrete adverseness
which sharpens the presentation of issues upon which the
court so largely depends for illumination of difficult constitutional
questions." *Baker* v. *Carr*, 369 U. S. 186, 204
(1962).

There are, of course, reasons to hear a case and issue a
ruling even when one party is reluctant to prevail in its
position. Unlike Article III requirements—which must
be satisfied by the parties before judicial consideration is
appropriate—the relevant prudential factors that counsel
against hearing this case are subject to "countervailing
considerations [that] may outweigh the concerns underlying
the usual reluctance to exert judicial power." *Warth*,
422 U. S., at 500–501. One consideration is the extent to
which adversarial presentation of the issues is assured by
the participation of *amici curiae* prepared to defend with
vigor the constitutionality of the legislative act. With
respect to this prudential aspect of standing as well, the
*Chadha* Court encountered a similar situation. It noted
that "there may be prudential, as opposed to Art. III,
concerns about sanctioning the adjudication of [this case]
in the absence of any participant supporting the validity of
[the statute]. The Court of Appeals properly dispelled any
such concerns by inviting and accepting briefs from both
Houses of Congress." 462 U. S., at 940. *Chadha* was not
an anomaly in this respect. The Court adopts the practice
of entertaining arguments made by an *amicus* when the

Opinion of the Court

Solicitor General confesses error with respect to a judgment below, even if the confession is in effect an admission that an Act of Congress is unconstitutional.  See, *e.g., Dickerson* v. *United States*, 530 U. S. 428 (2000).

In the case now before the Court the attorneys for BLAG present a substantial argument for the constitutionality of §3 of DOMA.  BLAG's sharp adversarial presentation of the issues satisfies the prudential concerns that otherwise might counsel against hearing an appeal from a decision with which the principal parties agree.  Were this Court to hold that prudential rules require it to dismiss the case, and, in consequence, that the Court of Appeals erred in failing to dismiss it as well, extensive litigation would ensue.  The district courts in 94 districts throughout the Nation would be without precedential guidance not only in tax refund suits but also in cases involving the whole of DOMA's sweep involving over 1,000 federal statutes and a myriad of federal regulations.  For instance, the opinion of the Court of Appeals for the First Circuit, addressing the validity of DOMA in a case involving regulations of the Department of Health and Human Services, likely would be vacated with instructions to dismiss, its ruling and guidance also then erased.  See *Massachusetts* v. *United States Dept. of Health and Human Servs.*, 682 F. 3d 1 (CA1 2012).  Rights and privileges of hundreds of thousands of persons would be adversely affected, pending a case in which all prudential concerns about justiciability are absent.  That numerical prediction may not be certain, but it is certain that the cost in judicial resources and expense of litigation for all persons adversely affected would be immense.  True, the very extent of DOMA's mandate means that at some point a case likely would arise without the prudential concerns raised here; but the costs, uncertainties, and alleged harm and injuries likely would continue for a time measured in years before the issue is resolved.  In these unusual and urgent circum-

stances, the very term "prudential" counsels that it is a proper exercise of the Court's responsibility to take jurisdiction. For these reasons, the prudential and Article III requirements are met here; and, as a consequence, the Court need not decide whether BLAG would have standing to challenge the District Court's ruling and its affirmance in the Court of Appeals on BLAG's own authority.

The Court's conclusion that this petition may be heard on the merits does not imply that no difficulties would ensue if this were a common practice in ordinary cases. The Executive's failure to defend the constitutionality of an Act of Congress based on a constitutional theory not yet established in judicial decisions has created a procedural dilemma. On the one hand, as noted, the Government's agreement with Windsor raises questions about the propriety of entertaining a suit in which it seeks affirmance of an order invalidating a federal law and ordering the United States to pay money. On the other hand, if the Executive's agreement with a plaintiff that a law is unconstitutional is enough to preclude judicial review, then the Supreme Court's primary role in determining the constitutionality of a law that has inflicted real injury on a plaintiff who has brought a justiciable legal claim would become only secondary to the President's. This would undermine the clear dictate of the separation-of-powers principle that "when an Act of Congress is alleged to conflict with the Constitution, '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Zivotofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (slip op., at 7) (quoting *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803)). Similarly, with respect to the legislative power, when Congress has passed a statute and a President has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify Congress' enactment solely on its own initiative and without any determination from the Court.

Opinion of the Court

The Court's jurisdictional holding, it must be underscored, does not mean the arguments for dismissing this dispute on prudential grounds lack substance. Yet the difficulty the Executive faces should be acknowledged. When the Executive makes a principled determination that a statute is unconstitutional, it faces a difficult choice. Still, there is no suggestion here that it is appropriate for the Executive as a matter of course to challenge statutes in the judicial forum rather than making the case to Congress for their amendment or repeal. The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise. But this case is not routine. And the capable defense of the law by BLAG ensures that these prudential issues do not cloud the merits question, which is one of immediate importance to the Federal Government and to hundreds of thousands of persons. These circumstances support the Court's decision to proceed to the merits.

III

When at first Windsor and Spyer longed to marry, neither New York nor any other State granted them that right. After waiting some years, in 2007 they traveled to Ontario to be married there. It seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage. For marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization. That belief, for many who long have held it, became even more urgent, more cherished when challenged. For others, however, came the beginnings of a new perspective, a new insight. Accordingly some States

concluded that same-sex marriage ought to be given
recognition and validity in the law for those same-sex
couples who wish to define themselves by their commit-
ment to each other.  The limitation of lawful marriage
to heterosexual couples, which for centuries had been
deemed both necessary and fundamental, came to be
seen in New York and certain other States as an unjust
exclusion.

Slowly at first and then in rapid course, the laws of
New York came to acknowledge the urgency of this issue for
same-sex couples who wanted to affirm their commitment
to one another before their children, their family, their
friends, and their community.  And so New York recog-
nized same-sex marriages performed elsewhere; and then
it later amended its own marriage laws to permit same-
sex marriage.  New York, in common with, as of this writ-
ing, 11 other States and the District of Columbia, decided
that same-sex couples should have the right to marry and
so live with pride in themselves and their union and in a
status of equality with all other married persons.  After a
statewide deliberative process that enabled its citizens to
discuss and weigh arguments for and against same-
sex marriage, New York acted to enlarge the definition of
marriage to correct what its citizens and elected repre-
sentatives perceived to be an injustice that they had not
earlier known or understood.  See Marriage Equality Act,
2011 N. Y. Laws 749 (codified at N. Y. Dom. Rel. Law Ann.
§§10–a, 10–b, 13 (West 2013)).

Against this background of lawful same-sex marriage
in some States, the design, purpose, and effect of DOMA
should be considered as the beginning point in deciding
whether it is valid under the Constitution.  By history and
tradition the definition and regulation of marriage, as will
be discussed in more detail, has been treated as being
within the authority and realm of the separate States.  Yet
it is further established that Congress, in enacting dis-

crete statutes, can make determinations that bear on marital rights and privileges. Just this Term the Court upheld the authority of the Congress to pre-empt state laws, allowing a former spouse to retain life insurance proceeds under a federal program that gave her priority, because of formal beneficiary designation rules, over the wife by a second marriage who survived the husband. *Hillman* v. *Maretta*, 569 U. S. ___ (2013); see also *Ridgway* v. *Ridgway*, 454 U. S. 46 (1981); *Wissner* v. *Wissner*, 338 U. S. 655 (1950). This is one example of the general principle that when the Federal Government acts in the exercise of its own proper authority, it has a wide choice of the mechanisms and means to adopt. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819). Congress has the power both to ensure efficiency in the administration of its programs and to choose what larger goals and policies to pursue.

Other precedents involving congressional statutes which affect marriages and family status further illustrate this point. In addressing the interaction of state domestic relations and federal immigration law Congress determined that marriages "entered into for the purpose of procuring an alien's admission [to the United States] as an immigrant" will not qualify the noncitizen for that status, even if the noncitizen's marriage is valid and proper for state-law purposes. 8 U. S. C. §1186a(b)(1) (2006 ed. and Supp. V). And in establishing income-based criteria for Social Security benefits, Congress decided that although state law would determine in general who qualifies as an applicant's spouse, common-law marriages also should be recognized, regardless of any particular State's view on these relationships. 42 U. S. C. §1382c(d)(2).

Though these discrete examples establish the constitutionality of limited federal laws that regulate the meaning of marriage in order to further federal policy, DOMA has a far greater reach; for it enacts a directive applicable to

over 1,000 federal statutes and the whole realm of federal regulations.  And its operation is directed to a class of persons that the laws of New York, and of 11 other States, have sought to protect.  See *Goodridge* v. *Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941 (2003); An Act Implementing the Guarantee of Equal Protection Under the Constitution of the State for Same Sex Couples, 2009 Conn. Pub. Acts no. 09–13; *Varnum* v. *Brien*, 763 N. W. 2d 862 (Iowa 2009); Vt. Stat. Ann., Tit. 15, §8 (2010); N. H. Rev. Stat. Ann. §457:1–a (West Supp. 2012); Religious Freedom and Civil Marriage Equality Amendment Act of 2009, 57 D. C. Reg. 27 (Dec. 18, 2009); N. Y. Dom. Rel. Law Ann. §10–a (West Supp. 2013); Wash. Rev. Code §26.04.010 (2012); Citizen Initiative, Same-Sex Marriage, Question 1 (Me. 2012) (results online at http://www.maine.gov/sos/cec/elec/2012/tab‑ref‑2012.html (all Internet sources as visited June 18, 2013, and available in Clerk of Court's case file)); Md. Fam. Law Code Ann. §2–201 (Lexis 2012); An Act to Amend Title 13 of the Delaware Code Relating to Domestic Relations to Provide for Same-Gender Civil Marriage and to Convert Existing Civil Unions to Civil Marriages, 79 Del. Laws ch. 19 (2013); An act relating to marriage; providing for civil marriage between two persons; providing for exemptions and protections based on religious association, 2013 Minn. Laws ch. 74; An Act Relating to Domestic Relations— Persons Eligible to Marry, 2013 R. I. Laws ch. 4.

In order to assess the validity of that intervention it is necessary to discuss the extent of the state power and authority over marriage as a matter of history and tradition.  State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, see*, e.g., Loving* v. *Virginia*, 388 U. S. 1 (1967); but, subject to those guarantees, "regulation of domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States."  *Sosna* v. *Iowa*, 419 U. S. 393,

Opinion of the Court

404 (1975).

The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens. See *Williams* v. *North Carolina*, 317 U. S. 287, 298 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders"). The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the "[p]rotection of offspring, property interests, and the enforcement of marital responsibilities." *Ibid.* "[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce." *Haddock* v. *Haddock*, 201 U. S. 562, 575 (1906); see also *In re Burrus*, 136 U. S. 586, 593–594 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States").

Consistent with this allocation of authority, the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations. In *De Sylva* v. *Ballentine*, 351 U. S. 570 (1956), for example, the Court held that, "[t]o decide who is the widow or widower of a deceased author, or who are his executors or next of kin," under the Copyright Act "requires a reference to the law of the State which created those legal relationships" because "there is no federal law of domestic relations." *Id.,* at 580. In order to respect this principle, the federal courts, as a general rule, do not adjudicate issues of marital status even when there might otherwise be a basis for federal jurisdiction. See *Ankenbrandt* v. *Richards*, 504 U. S. 689, 703 (1992). Federal courts will not hear divorce and custody cases even if they arise in diversity because of "the virtually exclusive primacy . . . of the

States in the regulation of domestic relations." *Id.,* at 714 (Blackmun, J., concurring in judgment).

The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for "when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States." *Ohio ex rel. Popovici* v. *Agler*, 280 U. S. 379, 383–384 (1930). Marriage laws vary in some respects from State to State. For example, the required minimum age is 16 in Vermont, but only 13 in New Hampshire. Compare Vt. Stat. Ann., Tit. 18, §5142 (2012), with N. H. Rev. Stat. Ann. §457:4 (West Supp. 2012). Likewise the permissible degree of consanguinity can vary (most States permit first cousins to marry, but a handful— such as Iowa and Washington, see Iowa Code §595.19 (2009); Wash. Rev. Code §26.04.020 (2012)—prohibit the practice). But these rules are in every event consistent within each State.

Against this background DOMA rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next. Despite these considerations, it is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution because it disrupts the federal balance. The State's power in defining the marital relation is of central relevance in this case quite apart from principles of federalism. Here the State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import. When the State used its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community. DOMA, because of

its reach and extent, departs from this history and tradition of reliance on state law to define marriage. "'[D]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" *Romer* v. *Evans*, 517 U. S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co.* v. *Coleman*, 277 U. S. 32, 37–38 (1928)).

The Federal Government uses this state-defined class for the opposite purpose—to impose restrictions and disabilities. That result requires this Court now to address whether the resulting injury and indignity is a deprivation of an essential part of the liberty protected by the Fifth Amendment. What the State of New York treats as alike the federal law deems unlike by a law designed to injure the same class the State seeks to protect.

In acting first to recognize and then to allow same-sex marriages, New York was responding "to the initiative of those who [sought] a voice in shaping the destiny of their own times." *Bond* v. *United States*, 564 U. S. ___, ___ (2011) (slip op., at 9). These actions were without doubt a proper exercise of its sovereign authority within our federal system, all in the way that the Framers of the Constitution intended. The dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other.

The States' interest in defining and regulating the marital relation, subject to constitutional guarantees, stems from the understanding that marriage is more than a routine classification for purposes of certain statutory benefits. Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form "but one element in a personal bond that is more enduring." *Lawrence* v. *Texas*, 539 U. S. 558, 567 (2003). By its recognition of the validity of same-sex

Opinion of the Court

marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond. For same-sex couples who wished to be married, the State acted to give their lawful conduct a lawful status. This status is a far-reaching legal acknowledgment of the intimate relationship between two people, a relationship deemed by the State worthy of dignity in the community equal with all other marriages. It reflects both the community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality.

IV

DOMA seeks to injure the very class New York seeks to protect. By doing so it violates basic due process and equal protection principles applicable to the Federal Government. See U. S. Const., Amdt. 5; *Bolling* v. *Sharpe*, 347 U. S. 497 (1954). The Constitution's guarantee of equality "must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot" justify disparate treatment of that group. *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 534–535 (1973). In determining whether a law is motived by an improper animus or purpose, "'[d]iscriminations of an unusual character'" especially require careful consideration. *Supra,* at 19 (quoting *Romer*, *supra*, at 633). DOMA cannot survive under these principles. The responsibility of the States for the regulation of domestic relations is an important indicator of the substantial societal impact the State's classifications have in the daily lives and customs of its people. DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages. This is strong evidence of a

law having the purpose and effect of disapproval of that class.  The avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States.

The history of DOMA's enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute.  It was its essence. The House Report announced its conclusion that "it is both appropriate and necessary for Congress to do what it can to defend the institution of traditional heterosexual marriage. . . . H. R. 3396 is appropriately entitled the 'Defense of Marriage Act.'  The effort to redefine 'marriage' to extend to homosexual couples is a truly radical proposal that would fundamentally alter the institution of marriage." H. R. Rep. No. 104–664, pp. 12–13 (1996).  The House concluded that DOMA expresses "both moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality."  *Id.,* at 16 (footnote deleted).  The stated purpose of the law was to promote an "interest in protecting the traditional moral teachings reflected in heterosexual-only marriage laws."  *Ibid.*  Were there any doubt of this far-reaching purpose, the title of the Act confirms it: The Defense of Marriage.

The arguments put forward by BLAG are just as candid about the congressional purpose to influence or interfere with state sovereign choices about who may be married. As the title and dynamics of the bill indicate, its purpose is to discourage enactment of state same-sex marriage laws and to restrict the freedom and choice of couples married under those laws if they are enacted.  The congressional goal was "to put a thumb on the scales and influence a

state's decision as to how to shape its own marriage laws."
*Massachusetts*, 682 F. 3d, at 12–13.  The Act's demon-
strated purpose is to ensure that if any State decides to
recognize same-sex marriages, those unions will be treated
as second-class marriages for purposes of federal law.
This raises a most serious question under the Constitu-
tion's Fifth Amendment.

DOMA's operation in practice confirms this purpose.
When New York adopted a law to permit same-sex mar-
riage, it sought to eliminate inequality; but DOMA frus-
trates that objective through a system-wide enactment
with no identified connection to any particular area of fed-
eral law.  DOMA writes inequality into the entire United
States Code.  The particular case at hand concerns the
estate tax, but DOMA is more than a simple determi-
nation of what should or should not be allowed as an
estate tax refund.  Among the over 1,000 statutes and
numerous federal regulations that DOMA controls are
laws pertaining to Social Security, housing, taxes, crimi-
nal sanctions, copyright, and veterans' benefits.

DOMA's principal effect is to identify a subset of state-
sanctioned marriages and make them unequal.  The prin-
cipal purpose is to impose inequality, not for other reasons
like governmental efficiency.  Responsibilities, as well as
rights, enhance the dignity and integrity of the person.
And DOMA contrives to deprive some couples married
under the laws of their State, but not other couples, of
both rights and responsibilities.  By creating two contra-
dictory marriage regimes within the same State, DOMA
forces same-sex couples to live as married for the purpose
of state law but unmarried for the purpose of federal
law, thus diminishing the stability and predictability of
basic personal relations the State has found it proper to
acknowledge and protect.  By this dynamic DOMA under-
mines both the public and private significance of state-
sanctioned same-sex marriages; for it tells those couples,

Opinion of the Court

and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see *Lawrence*, 539 U. S. 558, and whose relationship the State has sought to dignify. And it humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

Under DOMA, same-sex married couples have their lives burdened, by reason of government decree, in visible and public ways. By its great reach, DOMA touches many aspects of married and family life, from the mundane to the profound. It prevents same-sex married couples from obtaining government healthcare benefits they would otherwise receive. See 5 U. S. C. §§8901(5), 8905. It deprives them of the Bankruptcy Code's special protections for domestic-support obligations. See 11 U. S. C. §§101(14A), 507(a)(1)(A), 523(a)(5), 523(a)(15). It forces them to follow a complicated procedure to file their state and federal taxes jointly. Technical Bulletin TB–55, 2010 Vt. Tax LEXIS 6 (Oct. 7, 2010); Brief for Federalism Scholars as *Amici Curiae* 34. It prohibits them from being buried together in veterans' cemeteries. National Cemetery Administration Directive 3210/1, p. 37 (June 4, 2008).

For certain married couples, DOMA's unequal effects are even more serious. The federal penal code makes it a crime to "assaul[t], kidna[p], or murde[r] . . . a member of the immediate family" of "a United States official, a United States judge, [or] a Federal law enforcement officer," 18 U. S. C. §115(a)(1)(A), with the intent to influence or retaliate against that official, §115(a)(1). Although a "spouse" qualifies as a member of the officer's "immediate

family," §115(c)(2), DOMA makes this protection inapplicable to same-sex spouses.

   DOMA also brings financial harm to children of same-sex couples.  It raises the cost of health care for families by taxing health benefits provided by employers to their workers' same-sex spouses.  See 26 U. S. C. §106; Treas. Reg. §1.106–1, 26 CFR §1.106–1 (2012); IRS Private Letter Ruling 9850011 (Sept. 10, 1998).  And it denies or reduces benefits allowed to families upon the loss of a spouse and parent, benefits that are an integral part of family security.  See Social Security Administration, Social Security Survivors Benefits 5 (2012) (benefits available to a surviving spouse caring for the couple's child), online at http://www.ssa.gov/pubs/EN-05-10084.pdf.

   DOMA divests married same-sex couples of the duties and responsibilities that are an essential part of married life and that they in most cases would be honored to accept were DOMA not in force.  For instance, because it is expected that spouses will support each other as they pursue educational opportunities, federal law takes into consideration a spouse's income in calculating a student's federal financial aid eligibility.  See 20 U. S. C. §1087nn(b).  Same-sex married couples are exempt from this requirement.  The same is true with respect to federal ethics rules.  Federal executive and agency officials are prohibited from "participat[ing] personally and substantially" in matters as to which they or their spouses have a financial interest.  18 U. S. C. §208(a).  A similar statute prohibits Senators, Senate employees, and their spouses from accepting high-value gifts from certain sources, see 2 U. S. C. §31–2(a)(1), and another mandates detailed financial disclosures by numerous high-ranking officials and their spouses.  See 5 U. S. C. App. §§102(a), (e).  Under DOMA, however, these Government-integrity rules do not apply to same-sex spouses.

Opinion of the Court

*       *       *

The power the Constitution grants it also restrains. And though Congress has great authority to design laws to fit its own conception of sound national policy, it cannot deny the liberty protected by the Due Process Clause of the Fifth Amendment.

What has been explained to this point should more than suffice to establish that the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage. This requires the Court to hold, as it now does, that DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution.

The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws. See *Bolling*, 347 U. S., at 499–500; *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 217–218 (1995). While the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved.

The class to which DOMA directs its restrictions and restraints are those persons who are joined in same-sex marriages made lawful by the State. DOMA singles out a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty. It imposes a disability on the class by refusing to acknowledge a status the State finds to be dignified and proper. DOMA instructs all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others. The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its mar-

Opinion of the Court

riage laws, sought to protect in personhood and dignity. By seeking to displace this protection and treating those persons as living in marriages less respected than others, the federal statute is in violation of the Fifth Amendment. This opinion and its holding are confined to those lawful marriages.

The judgment of the Court of Appeals for the Second Circuit is affirmed.

*It is so ordered.*

ROBERTS, C. J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–307

———————

## UNITED STATES, PETITIONER *v.* EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS EXECUTOR OF THE ESTATE OF THEA CLARA SPYER, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2013]

CHIEF JUSTICE ROBERTS, dissenting.

I agree with JUSTICE SCALIA that this Court lacks jurisdiction to review the decisions of the courts below. On the merits of the constitutional dispute the Court decides to decide, I also agree with JUSTICE SCALIA that Congress acted constitutionally in passing the Defense of Marriage Act (DOMA). Interests in uniformity and stability amply justified Congress's decision to retain the definition of marriage that, at that point, had been adopted by every State in our Nation, and every nation in the world. *Post*, at 19–20 (dissenting opinion).

The majority sees a more sinister motive, pointing out that the Federal Government has generally (though not uniformly) deferred to state definitions of marriage in the past. That is true, of course, but none of those prior state-by-state variations had involved differences over something—as the majority puts it—"thought of by most people as essential to the very definition of [marriage] and to its role and function throughout the history of civilization." *Ante*, at 13. That the Federal Government treated this fundamental question differently than it treated variations over consanguinity or minimum age is hardly surprising—and hardly enough to support a conclusion that the "principal purpose," *ante*, at 22, of the 342 Representa-

2                  UNITED STATES *v.* WINDSOR

Roberts, C. J., dissenting

tives and 85 Senators who voted for it, and the President who signed it, was a bare desire to harm. Nor do the snippets of legislative history and the banal title of the Act to which the majority points suffice to make such a showing. At least without some more convincing evidence that the Act's principal purpose was to codify malice, and that it furthered *no* legitimate government interests, I would not tar the political branches with the brush of bigotry.

But while I disagree with the result to which the majority's analysis leads it in this case, I think it more important to point out that its analysis leads no further. The Court does not have before it, and the logic of its opinion does not decide, the distinct question whether the States, in the exercise of their "historic and essential authority to define the marital relation," *ante,* at 18, may continue to utilize the traditional definition of marriage.

The majority goes out of its way to make this explicit in the penultimate sentence of its opinion. It states that "[t]his opinion and its holding are confined to those lawful marriages," *ante,* at 26—referring to same-sex marriages that a State has already recognized as a result of the local "community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality." *Ante,* at 20. Justice Scalia believes this is a "'bald, unreasoned disclaime[r].'" *Post,* at 22. In my view, though, the disclaimer is a logical and necessary consequence of the argument the majority has chosen to adopt. The dominant theme of the majority opinion is that the Federal Government's intrusion into an area "central to state domestic relations law applicable to its residents and citizens" is sufficiently "unusual" to set off alarm bells. *Ante,* at 17, 20. I think the majority goes off course, as I have said, but it is undeniable that its judgment is based on federalism.

The majority extensively chronicles DOMA's departure from the normal allocation of responsibility between State

and Federal Governments, emphasizing that DOMA "rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State." *Ante,* at 18. But there is no such departure when one State adopts or keeps a definition of marriage that differs from that of its neighbor, for it is entirely expected that state definitions would "vary, subject to constitutional guarantees, from one State to the next." *Ibid.* Thus, while "[t]he State's power in defining the marital relation is of central relevance" to the majority's decision to strike down DOMA here, *ibid.*, that power will come into play on the other side of the board in future cases about the constitutionality of state marriage definitions. So too will the concerns for state diversity and sovereignty that weigh against DOMA's constitutionality in this case. See *ante,* at 19.

It is not just this central feature of the majority's analysis that is unique to DOMA, but many considerations on the periphery as well. For example, the majority focuses on the legislative history and title of this particular Act, *ante,* at 21; those statute-specific considerations will, of course, be irrelevant in future cases about different statutes. The majority emphasizes that DOMA was a "system-wide enactment with no identified connection to any particular area of federal law," but a State's definition of marriage "is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" *Ante,* at 22, 17. And the federal decision undermined (in the majority's view) the "dignity [already] conferred by the States in the exercise of their sovereign power," *ante,* at 21, whereas a State's decision whether to expand the definition of marriage from its traditional contours involves no similar concern.

We may in the future have to resolve challenges to state

4                 UNITED STATES *v.* WINDSOR

Roberts, C. J., dissenting

marriage definitions affecting same-sex couples. That
issue, however, is not before us in this case, and we hold
today that we lack jurisdiction to consider it in the partic-
ular context of *Hollingsworth* v. *Perry, ante,* p. ___. I write
only to highlight the limits of the majority's holding and
reasoning today, lest its opinion be taken to resolve not
only a question that I believe is not properly before us—
DOMA's constitutionality—but also a question that all
agree, and the Court explicitly acknowledges, is not at
issue.

SCALIA, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 12–307

————

## UNITED STATES, PETITIONER *v.* EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS EXECUTOR OF THE ESTATE OF THEA CLARA SPYER, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2013]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, and with whom THE CHIEF JUSTICE joins as to Part I, dissenting.

This case is about power in several respects. It is about the power of our people to govern themselves, and the power of this Court to pronounce the law. Today's opinion aggrandizes the latter, with the predictable consequence of diminishing the former. We have no power to decide this case. And even if we did, we have no power under the Constitution to invalidate this democratically adopted legislation. The Court's errors on both points spring forth from the same diseased root: an exalted conception of the role of this institution in America.

### I
#### A

The Court is eager—*hungry*—to tell everyone its view of the legal question at the heart of this case. Standing in the way is an obstacle, a technicality of little interest to anyone but the people of We the People, who created it as a barrier against judges' intrusion into their lives. They gave judges, in Article III, only the "judicial Power," a power to decide not abstract questions but real, concrete

"Cases" and "Controversies."  Yet the plaintiff and the Government agree entirely on what should happen in this lawsuit.  They agree that the court below got it right; and they agreed in the court below that the court below that one got it right as well.  What, then, are we *doing* here?

The answer lies at the heart of the jurisdictional portion of today's opinion, where a single sentence lays bare the majority's vision of our role.  The Court says that we have the power to decide this case because if we did not, then our "primary role in determining the constitutionality of a law" (at least one that "has inflicted real injury on a plaintiff") would "become only secondary to the President's." *Ante,* at 12.  But wait, the reader wonders—Windsor won below, and so *cured* her injury, and the President was glad to see it.  True, says the majority, but judicial review must march on regardless, lest we "undermine the clear dictate of the separation-of-powers principle that when an Act of Congress is alleged to conflict with the Constitution, it is emphatically the province and duty of the judicial department to say what the law is." *Ibid.* (internal quotation marks and brackets omitted).

That is jaw-dropping.  It is an assertion of judicial supremacy over the people's Representatives in Congress and the Executive.  It envisions a Supreme Court standing (or rather enthroned) at the apex of government, empowered to decide all constitutional questions, always and everywhere "primary" in its role.

This image of the Court would have been unrecognizable to those who wrote and ratified our national charter.  They knew well the dangers of "primary" power, and so created branches of government that would be "perfectly coordinate by the terms of their common commission," none of which branches could "pretend to an exclusive or superior right of settling the boundaries between their respective powers."  The Federalist, No. 49, p. 314 (C. Rossiter ed. 1961) (J. Madison).  The people did this to protect

themselves.  They did it to guard their right to self-rule against the black-robed supremacy that today's majority finds so attractive.  So it was that Madison could confidently state, with no fear of contradiction, that there was nothing of "greater intrinsic value" or "stamped with the authority of more enlightened patrons of liberty" than a government of separate and coordinate powers.  *Id.*, No. 47, at 301.

For this reason we are quite forbidden to say what the law is whenever (as today's opinion asserts) "'an Act of Congress is alleged to conflict with the Constitution.'" *Ante*, at 12.  We can do so only when that allegation will determine the outcome of a lawsuit, and is contradicted by the other party.  The "judicial Power" is not, as the majority believes, the power "'to say what the law is,'" *ibid.,* giving the Supreme Court the "primary role in determining the constitutionality of laws."  The majority must have in mind one of the foreign constitutions that pronounces such primacy for its constitutional court and allows that primacy to be exercised in contexts other than a lawsuit.  See, *e.g.,* Basic Law for the Federal Republic of Germany, Art. 93.  The judicial power as Americans have understood it (and their English ancestors before them) is the power to adjudicate, with conclusive effect, disputed government claims (civil or criminal) against private persons, and disputed claims by private persons against the government or other private persons.  Sometimes (though not always) the parties before the court disagree not with regard to the facts of their case (or not *only* with regard to the facts) but with regard to the applicable law—in which event (and *only* in which event) it becomes the "'province and duty of the judicial department to say what the law is.'" *Ante*, at 12.

In other words, declaring the compatibility of state or federal laws with the Constitution is not only not the "primary role" of this Court, it is not a separate, free-

4                UNITED STATES *v.* WINDSOR

S͟C͟A͟L͟I͟A͟, J., dissenting

standing role *at all*.  We perform that role incidentally—by
accident, as it were—when that is necessary to resolve the
dispute before us.  Then, and only then, does it become
"'the province and duty of the judicial department to say
what the law is.'"  That is why, in 1793, we politely de-
clined the Washington Administration's request to "say
what the law is" on a particular treaty matter that was
not the subject of a concrete legal controversy.  3 Corre-
spondence and Public Papers of John Jay 486–489 (H.
Johnston ed. 1893).  And that is why, as our opinions have
said, some questions of law will *never* be presented to this
Court, because there will never be anyone with standing
to bring a lawsuit.  See *Schlesinger* v. *Reservists Comm. to
Stop the War*, 418 U. S. 208, 227 (1974); *United States* v.
*Richardson*, 418 U. S. 166, 179 (1974).  As Justice Bran-
deis put it, we cannot "pass upon the constitutionality of
legislation in a friendly, non-adversary, proceeding"; ab-
sent a "'real, earnest and vital controversy between indi-
viduals,'" we have neither any work to do nor any power to
do it.  *Ashwander* v. *TVA*, 297 U. S. 288, 346 (1936) (con-
curring opinion) (quoting *Chicago & Grand Trunk R. Co.*
v. *Wellman*, 143 U. S. 339, 345 (1892)).  Our authority
begins and ends with the need to adjudge the rights of an
injured party who stands before us seeking redress.  *Lujan*
v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992).

    That is completely absent here.  Windsor's injury was
cured by the judgment in her favor.  And while, in ordi-
nary circumstances, the United States is injured by a
directive to pay a tax refund, this suit is far from ordinary.
Whatever injury the United States has suffered will surely
not be redressed by the action that it, as a litigant, asks us
to take.  The final sentence of the Solicitor General's brief
on the merits reads:  "For the foregoing reasons, the judg-
ment of the court of appeals *should be affirmed*."  Brief for
United States (merits) 54 (emphasis added).  That will not
cure the Government's injury, but carve it into stone.  One

SCALIA, J., dissenting

could spend many fruitless afternoons ransacking our library for any other petitioner's brief seeking an affirmance of the judgment against it.[1]  What the petitioner United States asks us to do in the case before us is exactly what the respondent Windsor asks us to do: not to provide relief from the judgment below but to say that that judgment was correct.  And the same was true in the Court of Appeals: Neither party sought to undo the judgment for Windsor, and so that court should have dismissed the appeal (just as we should dismiss) for lack of jurisdiction.  Since both parties agreed with the judgment of the District Court for the Southern District of New York, the suit should have ended there.  The further proceedings have been a contrivance, having no object in mind except to elevate a District Court judgment that has no precedential effect in other courts, to one that has precedential effect throughout the Second Circuit, and then (in this Court) precedential effect throughout the United States.

We have never before agreed to speak—to "say what the law is"—where there is no controversy before us.  In the more than two centuries that this Court has existed as an institution, we have never suggested that we have the power to decide a question when every party agrees with both its nominal opponent *and the court below* on that question's answer.  The United States reluctantly conceded that at oral argument.  See Tr. of Oral Arg. 19–20.

The closest we have ever come to what the Court blesses today was our opinion in *INS* v. *Chadha*, 462 U. S. 919 (1983).  But in that case, two parties to the litigation

---

[1] For an even more advanced scavenger hunt, one might search the annals of Anglo-American law for another "Motion to Dismiss" like the one the United States filed in District Court: It argued that the court should agree "with Plaintiff and the United States" and "*not* dismiss" the complaint.  (Emphasis mine.)  Then, having gotten exactly what it asked for, the United States promptly appealed.

SCALIA, J., dissenting

disagreed with the position of the United States and with the court below: the House and Senate, which had intervened in the case. Because *Chadha* concerned the validity of a mode of congressional action—the one-house legislative veto—the House and Senate were threatened with destruction of what they claimed to be one of their institutional powers. The Executive choosing not to defend that power,[2] we permitted the House and Senate to intervene. Nothing like that is present here.

To be sure, the Court in *Chadha* said that statutory aggrieved-party status was "not altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional." *Id.*, at 930–931. But in a footnote to that statement, the Court acknowledged Article III's separate requirement of a "justiciable case or controversy," and stated that *this* requirement was satisfied "because of the presence of the two Houses of Congress as adverse parties." *Id.,* at 931, n. 6. Later in its opinion, the *Chadha* Court remarked that the United States' announced intention to enforce the statute also sufficed to permit judicial review, even absent congressional participation. *Id.,* at 939. That remark is true, as a description of the judicial review conducted in the Court of Appeals, where the Houses of Congress had not inter-

---

[2] There the Justice Department's refusal to defend the legislation was in accord with its longstanding (and entirely reasonable) practice of declining to defend legislation that in its view infringes upon Presidential powers. There is no justification for the Justice Department's abandoning the law in the present case. The majority opinion makes a point of scolding the President for his "failure to defend the constitutionality of an Act of Congress based on a constitutional theory not yet established in judicial decisions," *ante,* at 12. But the rebuke is tongue-in-cheek, for the majority gladly gives the President what he wants. Contrary to all precedent, it decides this case (and even decides it the way the President wishes) *despite* his abandonment of the defense and the consequent absence of a case or controversy.

vened. (The case originated in the Court of Appeals, since it sought review of agency action under 8 U. S. C. §1105a(a) (1976 ed.).) There, absent a judgment setting aside the INS order, Chadha faced deportation. This passage of our opinion seems to be addressing that initial standing in the Court of Appeals, as indicated by its quotation from the lower court's opinion, 462 U. S., at 939–940. But if it was addressing standing to pursue the appeal, the remark was both the purest dictum (as congressional intervention at that point made the required adverseness "beyond doubt," *id.*, at 939), and quite incorrect. When a private party has a judicial decree safely in hand to prevent his injury, additional judicial action requires that a party injured by the decree *seek to undo it*. In *Chadha*, the intervening House and Senate fulfilled that requirement. Here no one does.

The majority's discussion of the requirements of Article III bears no resemblance to our jurisprudence. It accuses the *amicus* (appointed to argue against our jurisdiction) of "elid[ing] the distinction between . . . the jurisdictional requirements of Article III and the prudential limits on its exercise." *Ante*, at 6. It then proceeds to call the requirement of adverseness a "prudential" aspect of standing. *Of standing.* That is incomprehensible. A plaintiff (or appellant) can have all the standing in the world—satisfying all three standing requirements of *Lujan* that the majority so carefully quotes, *ante,* at 7—and yet no Article III controversy may be before the court. Article III requires not just a plaintiff (or appellant) who has standing to complain but *an opposing party* who denies the validity of the complaint. It is not the *amicus* that has done the eliding of distinctions, but the majority, calling the quite separate Article III requirement of adverseness between the parties an element (which it then pronounces a "prudential" element) of standing. The question here is not whether, as the majority puts it, "the United States retains a stake

sufficient to support Article III jurisdiction," *ibid.* the question is whether there is any controversy (which requires *contradiction*) between the United States and Ms. Windsor.  There is not.

I find it wryly amusing that the majority seeks to dismiss the requirement of party-adverseness as nothing more than a "prudential" aspect of the sole Article III requirement of standing.  (Relegating a jurisdictional requirement to "prudential" status is a wondrous device, enabling courts to ignore the requirement whenever they believe it "prudent"—which is to say, a good idea.)  Half a century ago, a Court similarly bent upon announcing its view regarding the constitutionality of a federal statute achieved that goal by effecting a remarkably similar *but completely opposite* distortion of the principles limiting our jurisdiction.  The Court's notorious opinion in *Flast* v. *Cohen*, 392 U. S. 83, 98–101 (1968), held that *standing* was merely an element (which it pronounced to be a "prudential" element) of the sole Article III requirement of *adverseness*.  We have been living with the chaos created by that power-grabbing decision ever since, see *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587 (2007), as we will have to live with the chaos created by this one.

The authorities the majority cites fall miles short of supporting the counterintuitive notion that an Article III "controversy" can exist without disagreement between the parties.  In *Deposit Guaranty Nat. Bank* v. *Roper*, 445 U. S. 326 (1980), the District Court had entered judgment in the individual plaintiff's favor based on the defendant bank's offer to pay the full amount claimed.  The plaintiff, however, sought to appeal the District Court's denial of class certification under Federal Rule of Civil Procedure 23.  There was a continuing dispute between the parties concerning the issue raised on appeal.  The same is true of the other case cited by the majority, *Camreta* v. *Greene*,

563 U. S. ___ (2011).  There the District Court found that
the defendant state officers had violated the Fourth
Amendment, but rendered judgment in their favor because
they were entitled to official immunity, application of the
Fourth Amendment to their conduct not having been clear
at the time of violation.   The officers sought to appeal
the holding of Fourth Amendment violation, which would
circumscribe their future conduct; the plaintiff continued
to insist that a Fourth Amendment violation had occurred.
The "prudential" discretion to which both those cases refer
was the discretion to *deny* an appeal even when a live
controversy exists—not the discretion to *grant* one when it
does not.   The majority can cite no case in which this
Court entertained an appeal in which both parties urged
us to affirm the judgment below.   And that is because the
existence of a controversy is not a "prudential" require-
ment that we have invented, but an essential element of
an Article III case or controversy.   The majority's notion
that a case between friendly parties can be entertained so
long as "adversarial presentation of the issues is assured
by the participation of *amici curiae* prepared to defend
with vigor" the other side of the issue, *ante*, at 10, effects a
breathtaking revolution in our Article III jurisprudence.

It may be argued that if what we say is true some Presi-
dential determinations that statutes are unconstitutional
will not be subject to our review.   That is as it should
be, when both the President and the plaintiff agree that
the statute is unconstitutional.   Where the Executive is en-
forcing an unconstitutional law, suit will of course lie; but
if, in that suit, the Executive admits the unconstitution-
ality of the law, the litigation should end in an order or a
consent decree enjoining enforcement.   This suit saw the
light of day only because the President enforced the Act
(and thus gave Windsor standing to sue) even though he
believed it unconstitutional.   He could have equally chosen
(more appropriately, some would say) neither to enforce

nor to defend the statute he believed to be unconstitutional, see Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199 (Nov. 2, 1994)—in which event Windsor would not have been injured, the District Court could not have refereed this friendly scrimmage, and the Executive's determination of unconstitutionality would have escaped this Court's desire to blurt out its view of the law.  The matter would have been left, as so many matters ought to be left, to a tug of war between the President and the Congress, which has innumerable means (up to and including impeachment) of compelling the President to enforce the laws it has written.  Or the President could have evaded presentation of the constitutional issue to this Court simply by declining to appeal the District Court and Court of Appeals dispositions he agreed with.  Be sure of this much: If a President wants to insulate his judgment of unconstitutionality from our review, he can.  What the views urged in this dissent produce is not insulation from judicial review but insulation from Executive contrivance.

The majority brandishes the famous sentence from *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803) that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Ante*, at 12 (internal quotation marks omitted).  But that sentence neither says nor implies that it is *always* the province and duty of the Court to say what the law is—much less that its responsibility in that regard is a "primary" one.  The very next sentence of Chief Justice Marshall's opinion makes the crucial qualification that today's majority ignores: "*Those who apply the rule to particular cases*, must of necessity expound and interpret that rule."  1 Cranch, at 177 (emphasis added).  Only when a "particular case" is before us—that is, a controversy that it is our business to resolve under Article III—do we have the province and duty to pronounce the law.  For the views of our early Court more

precisely addressing the question before us here, the majority ought instead to have consulted the opinion of Chief Justice Taney in *Lord* v. *Veazie*, 8 How. 251 (1850):

> "The objection in the case before us is . . . that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be.
>
> "A judgment entered under such circumstances, and for such purposes, is a mere form. The whole proceeding was in contempt of the court, and highly reprehensible . . . . A judgment in form, thus procured, in the eye of the law is no judgment of the court. It is a nullity, and no writ of error will lie upon it. This writ is, therefore, dismissed." *Id.,* at 255–256.

There is, in the words of *Marbury,* no "necessity [to] expound and interpret" the law in this case; just a desire to place this Court at the center of the Nation's life. 1 Cranch, at 177.

### B

A few words in response to the theory of jurisdiction set forth in JUSTICE ALITO's dissent: Though less far reaching in its consequences than the majority's conversion of constitutionally required adverseness into a discretionary element of standing, the theory of that dissent similarly elevates the Court to the "primary" determiner of constitutional questions involving the separation of powers, and, to boot, increases the power of the most dangerous branch: the "legislative department," which by its nature "draw[s] all power into its impetuous vortex." The Federalist, No. 48, at 309 (J. Madison). Heretofore in our national history, the President's failure to "take Care that the Laws be faithfully executed," U. S. Const., Art. II, §3, could only be

brought before a judicial tribunal by someone whose
concrete interests were harmed by that alleged failure.
Justice Alito would create a system in which Congress
can hale the Executive before the courts not only to vindi-
cate its own institutional powers to act, but to correct a
perceived inadequacy in the execution of its laws.[3]  This
would lay to rest Tocqueville's praise of our judicial system
as one which "intimately bind[s] the case made for the law
with the case made for one man," one in which legislation
is "no longer exposed to the daily aggression of the par-
ties," and in which "[t]he political question that [the judge]
must resolve is linked to the interest" of private litigants.
A. de Tocqueville, Democracy in America 97 (H. Mansfield

---

[3]Justice Alito attempts to limit his argument by claiming that Con-
gress is injured (and can therefore appeal) when its statute is held
unconstitutional without Presidential defense, but is *not* injured when
its statute is held unconstitutional *despite* Presidential defense.  I do
not understand that line.  The injury to Congress is the same whether
the President has defended the statute or not.  And if the injury is
threatened, why should Congress not be able to participate in the suit
from the beginning, just as the President can?  And if having a statute
declared unconstitutional (and therefore inoperative) by a court is an
injury, why is it not an injury when a statute is declared unconstitu-
tional by the President and rendered inoperative by his consequent
failure to enforce it?  Or when the President simply declines to enforce
it without opining on its constitutionality?  If it is the *inoperativeness*
that constitutes the injury—the "impairment of [the legislative] func-
tion," as Justice Alito puts it, *post,* at 4—it should make no difference
which of the other two branches inflicts it, and whether the Constitu-
tion is the pretext.  A principled and predictable system of jurispru-
dence cannot rest upon a shifting concept of injury, designed to support
standing when we would like it.  If this Court agreed with Justice
Alito's distinction, its opinion in *Raines* v. *Byrd,* 521 U. S. 811 (1997),
which involved an original suit by Members of Congress challenging an
assertedly unconstitutional law, would have been written quite differ-
ently; and Justice Alito's distinguishing of that case on grounds quite
irrelevant to his theory of standing would have been unnecessary.

Scalia, J., dissenting

& D. Winthrop eds. 2000). That would be replaced by a system in which Congress and the Executive can pop immediately into court, in their institutional capacity, whenever the President refuses to implement a statute he believes to be unconstitutional, and whenever he implements a law in a manner that is not to Congress's liking.

Justice Alito's notion of standing will likewise enormously shrink the area to which "judicial censure, exercised by the courts on legislation, cannot extend," *ibid.* For example, a bare majority of both Houses could bring into court the assertion that the Executive's implementation of welfare programs is too generous—a failure that no other litigant would have standing to complain about. Moreover, as we indicated in *Raines* v. *Byrd*, 521 U. S. 811, 828 (1997), if Congress can sue the Executive for the erroneous application of the law that "injures" its power to legislate, surely the Executive can sue Congress for its erroneous adoption of an unconstitutional law that "injures" the Executive's power to administer—or perhaps for its protracted failure to act on one of his nominations. The opportunities for dragging the courts into disputes hitherto left for political resolution are endless.

Justice Alito's dissent is correct that *Raines* did not formally decide this issue, but its reasoning does. The opinion spends three pages discussing famous, decades-long disputes between the President and Congress—regarding congressional power to forbid the Presidential removal of executive officers, regarding the legislative veto, regarding congressional appointment of executive officers, and regarding the pocket veto—that would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation. But it does not, and never has; the "enormous power that the judiciary would acquire" from the ability to adjudicate such suits "would have made a mockery of [Hamilton's]

quotation of Montesquieu to the effect that 'of the three powers above mentioned . . . the JUDICIARY is next to nothing.'" *Barnes* v. *Kline*, 759 F. 2d 21, 58 (CADC 1985) (Bork, J., dissenting) (quoting The Federalist No. 78 (A. Hamilton)).

To be sure, if Congress cannot invoke our authority in the way that J<small>USTICE</small> A<small>LITO</small> proposes, then its only recourse is to confront the President directly. Unimaginable evil this is not. Our system is *designed* for confrontation. That is what "[a]mbition . . . counteract[ing] ambition," The Federalist, No. 51, at 322 (J. Madison), is all about. If majorities in both Houses of Congress care enough about the matter, they have available innumerable ways to compel executive action without a lawsuit—from refusing to confirm Presidential appointees to the elimination of funding. (Nothing says "enforce the Act" quite like ". . . or you will have money for little else.") But the condition is crucial; Congress must care enough to act against the President itself, not merely enough to instruct its lawyers to ask *us* to do so. Placing the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership does not do the system a favor. And by the way, if the President loses the lawsuit but does not faithfully implement the Court's decree, just as he did not faithfully implement Congress's statute, what then? Only Congress can bring him to heel by . . . what do you think? Yes: a direct confrontation with the President.

II

For the reasons above, I think that this Court has, and the Court of Appeals had, no power to decide this suit. We should vacate the decision below and remand to the Court of Appeals for the Second Circuit, with instructions to dismiss the appeal. Given that the majority has volunteered its view of the merits, however, I proceed to discuss that as well.

### A

There are many remarkable things about the majority's merits holding.  The first is how rootless and shifting its justifications are.  For example, the opinion starts with seven full pages about the traditional power of States to define domestic relations—initially fooling many readers, I am sure, into thinking that this is a federalism opinion. But we are eventually told that "it is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution," and that "[t]he State's power in defining the marital relation is of central relevance in this case quite apart from principles of federalism" because "the State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import."  *Ante,* at 18.  But no one questions the power of the States to define marriage (with the concomitant conferral of dignity and status), so what is the point of devoting seven pages to describing how long and well established that power is?  Even after the opinion has formally disclaimed reliance upon principles of federalism, mentions of "the usual tradition of recognizing and accepting state definitions of marriage" continue.  See, *e.g., ante,* at 20.  What to make of this?  The opinion never explains. My guess is that the majority, while reluctant to suggest that defining the meaning of "marriage" in federal statutes is unsupported by any of the Federal Government's enumerated powers,[4] nonetheless needs some rhetorical basis to support its pretense that today's prohibition of

---

[4]Such a suggestion would be impossible, given the Federal Government's long history of making pronouncements regarding marriage—for example, conditioning Utah's entry into the Union upon its prohibition of polygamy.  See Act of July 16, 1894, ch. 138, §3, 28 Stat. 108 ("The constitution [of Utah]" must provide "perfect toleration of religious sentiment," "*Provided*, That polygamous or plural marriages are forever prohibited").

SCALIA, J., dissenting

laws excluding same-sex marriage is confined to the Federal Government (leaving the second, state-law shoe to be dropped later, maybe next Term). But I am only guessing.

Equally perplexing are the opinion's references to "the Constitution's guarantee of equality." *Ibid.* Near the end of the opinion, we are told that although the "equal protection guarantee of the Fourteenth Amendment makes [the] Fifth Amendment [due process] right all the more specific and all the better understood and preserved"—what can *that* mean?—"the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does." *Ante,* at 25. The only possible interpretation of this statement is that the Equal Protection Clause, even the Equal Protection Clause as incorporated in the Due Process Clause, is not the basis for today's holding. But the portion of the majority opinion that explains why DOMA is unconstitutional (Part IV) begins by citing *Bolling* v. *Sharpe*, 347 U. S. 497 (1954), *Department of Agriculture* v. *Moreno*, 413 U. S. 528 (1973), and *Romer* v. *Evans*, 517 U. S. 620 (1996)—*all* of which are equal-protection cases.[5] And those three cases are the *only* authorities that the Court cites in Part IV about the Constitution's meaning, except for its citation of *Lawrence* v. *Texas*, 539 U. S. 558 (2003) (not an equal-protection case) to support its passing assertion that the Constitution protects the "moral and sexual choices" of same-sex couples, *ante,* at 23.

Moreover, if this is meant to be an equal-protection opinion, it is a confusing one. The opinion does not resolve and indeed does not even mention what had been the

———————

[5] Since the Equal Protection Clause technically applies only against the States, see U. S. Const., Amdt. 14, *Bolling* and *Moreno*, dealing with federal action, relied upon "the equal protection component of the Due Process Clause of the Fifth Amendment," *Moreno*, 413 U. S., at 533.

central question in this litigation: whether, under the Equal Protection Clause, laws restricting marriage to a man and a woman are reviewed for more than mere rationality.  That is the issue that divided the parties and the court below, compare Brief for Respondent Bipartisan Legal Advisory Group of U. S. House of Representatives (merits) 24–28 (no), with Brief for Respondent Windsor (merits) 17–31 and Brief for United States (merits) 18–36 (yes); and compare 699 F. 3d 169, 180–185 (CA2 2012) (yes), with *id.,* at 208–211 (Straub, J., dissenting in part and concurring in part) (no).  In accord with my previously expressed skepticism about the Court's "tiers of scrutiny" approach, I would review this classification only for its rationality.  See *United States* v. *Virginia*, 518 U. S. 515, 567–570 (1996) (SCALIA, J., dissenting).  As nearly as I can tell, the Court agrees with that; its opinion does not apply strict scrutiny, and its central propositions are taken from rational-basis cases like *Moreno*.  But the Court certainly does not *apply* anything that resembles that deferential framework.  See *Heller* v. *Doe*, 509 U. S. 312, 320 (1993) (a classification "'must be upheld . . . if there is any reasonably conceivable state of facts'" that could justify it).

The majority opinion need not get into the strict-vs.-rational-basis scrutiny question, and need not justify its holding under either, because it says that DOMA is unconstitutional as "a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution," *ante,* at 25; that it violates "basic due process" principles, *ante,* at 20; and that it inflicts an "injury and indignity" of a kind that denies "an essential part of the liberty protected by the Fifth Amendment," *ante,* at 19.  The majority never utters the dread words "substantive due process," perhaps sensing the disrepute into which that doctrine has fallen, but that is what those statements mean.  Yet the opinion does not argue that same-sex marriage is "deeply rooted in this Nation's history and tradition,"

18          UNITED STATES *v.* WINDSOR

S<span>CALIA</span>, J., dissenting

*Washington* v. *Glucksberg*, 521 U. S. 702, 720–721 (1997), a claim that would of course be quite absurd. So would the further suggestion (also necessary, under our substantive-due-process precedents) that a world in which DOMA exists is one bereft of "'ordered liberty.'" *Id.,* at 721 (quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937)).

Some might conclude that this loaf could have used a while longer in the oven. But that would be wrong; it is already overcooked. The most expert care in preparation cannot redeem a bad recipe. The sum of all the Court's nonspecific hand-waving is that this law is invalid (maybe on equal-protection grounds, maybe on substantive-due-process grounds, and perhaps with some amorphous federalism component playing a role) because it is motivated by a "'bare . . . desire to harm'" couples in same-sex marriages. *Ante,* at 20. It is this proposition with which I will therefore engage.

B

As I have observed before, the Constitution does not forbid the government to enforce traditional moral and sexual norms. See *Lawrence* v. *Texas*, 539 U. S. 558, 599 (2003) (S<span>CALIA</span>, J., dissenting). I will not swell the U. S. Reports with restatements of that point. It is enough to say that the Constitution neither requires nor forbids our society to approve of same-sex marriage, much as it neither requires nor forbids us to approve of no-fault divorce, polygamy, or the consumption of alcohol.

However, even setting aside traditional moral disapproval of same-sex marriage (or indeed same-sex sex), there are many perfectly valid—indeed, downright boring—justifying rationales for this legislation. Their existence ought to be the end of this case. For they give the lie to the Court's conclusion that only those with hateful hearts could have voted "aye" on this Act. And more importantly, they serve to make the contents of the legis-

lators' hearts quite irrelevant: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States* v. *O'Brien*, 391 U. S. 367, 383 (1968). Or at least it *was* a familiar principle. By holding to the contrary, the majority has declared open season on any law that (in the opinion of the law's opponents and any panel of like-minded federal judges) can be characterized as mean-spirited.

The majority concludes that the only motive for this Act was the "bare . . . desire to harm a politically unpopular group." *Ante,* at 20. Bear in mind that the object of this condemnation is not the legislature of some once-Confederate Southern state (familiar objects of the Court's scorn, see, *e.g.*, *Edwards* v. *Aguillard*, 482 U. S. 578 (1987)), but our respected coordinate branches, the Congress and Presidency of the United States. Laying such a charge against them should require the most extraordinary evidence, and I would have thought that every attempt would be made to indulge a more anodyne explanation for the statute. The majority does the opposite— affirmatively concealing from the reader the arguments that exist in justification. It makes only a passing mention of the "arguments put forward" by the Act's defenders, and does not even trouble to paraphrase or describe them. See *ante*, at 21. I imagine that this is because it is harder to maintain the illusion of the Act's supporters as unhinged members of a wild-eyed lynch mob when one first describes their views as *they* see them.

To choose just one of these defenders' arguments, DOMA avoids difficult choice-of-law issues that will now arise absent a uniform federal definition of marriage. See, *e.g.,* Baude, Beyond DOMA: Choice of State Law in Federal Statutes, 64 Stan. L. Rev. 1371 (2012). Imagine a pair of women who marry in Albany and then move to Alabama, which does not "recognize as valid any marriage of

parties of the same sex." Ala. Code §30–1–19(e) (2011).
When the couple files their next federal tax return, may it
be a joint one? Which State's law controls, for federal-law
purposes: their State of celebration (which recognizes the
marriage) or their State of domicile (which does not)?
(Does the answer depend on whether they were just visit-
ing in Albany?) Are these questions to be answered as a
matter of federal common law, or perhaps by borrowing a
State's choice-of-law rules? If so, *which* State's? And what
about States where the status of an out-of-state same-sex
marriage is an unsettled question under local law? See
*Godfrey* v. *Spano*, 13 N.Y. 3d 358, 920 N.E. 2d 328
(2009). DOMA avoided all of this uncertainty by speci-
fying which marriages would be recognized for federal
purposes. That is a classic purpose for a definitional
provision.

Further, DOMA preserves the intended effects of prior
legislation against then-unforeseen changes in circum-
stance. When Congress provided (for example) that a
special estate-tax exemption would exist for spouses, this
exemption reached only *opposite-sex* spouses—those being
the only sort that were recognized in *any* State at the time
of DOMA's passage. When it became clear that changes in
state law might one day alter that balance, DOMA's defi-
nitional section was enacted to ensure that state-level
experimentation did not automatically alter the basic
operation of federal law, unless and until Congress made
the further judgment to do so on its own. That is not
animus—just stabilizing prudence. Congress has hardly
demonstrated itself unwilling to make such further, revis-
ing judgments upon due deliberation. See, *e.g.,* Don't Ask,
Don't Tell Repeal Act of 2010, 124 Stat. 3515.

The Court mentions none of this. Instead, it accuses the
Congress that enacted this law and the President who
signed it of something much worse than, for example,
having acted in excess of enumerated federal powers—or

SCALIA, J., dissenting

even having drawn distinctions that prove to be irrational. Those legal errors may be made in good faith, errors though they are. But the majority says that the supporters of this Act acted with *malice*—with *the "purpose"* (*ante,* at 25) "to disparage and to injure" same-sex couples. It says that the motivation for DOMA was to "demean," *ibid.*; to "impose inequality," *ante,* at 22; to "impose . . . a stigma," *ante,* at 21; to deny people "equal dignity," *ibid.*; to brand gay people as "unworthy," *ante,* at 23; and to "*humiliat[e]*" their children, *ibid.* (emphasis added).

I am sure these accusations are quite untrue. To be sure (as the majority points out), the legislation is called the Defense of Marriage Act. But to defend traditional marriage is not to condemn, demean, or humiliate those who would prefer other arrangements, any more than to defend the Constitution of the United States is to condemn, demean, or humiliate other constitutions. To hurl such accusations so casually demeans *this institution*. In the majority's judgment, any resistance to its holding is beyond the pale of reasoned disagreement. To question its high-handed invalidation of a presumptively valid statute is to act (the majority is sure) with *the purpose* to "disparage," "injure," "degrade," "demean," and "humiliate" our fellow human beings, our fellow citizens, who are homosexual. All that, simply for supporting an Act that did no more than codify an aspect of marriage that had been unquestioned in our society for most of its existence—indeed, had been unquestioned in virtually all societies for virtually all of human history. It is one thing for a society to elect change; it is another for a court of law to impose change by adjudging those who oppose it *hostes humani generis*, enemies of the human race.

\*          \*          \*

The penultimate sentence of the majority's opinion is a naked declaration that "[t]his opinion and its holding are

confined" to those couples "joined in same-sex marriages
made lawful by the State." *Ante,* at 26, 25. I have heard
such "bald, unreasoned disclaimer[s]" before. *Lawrence*,
539 U. S., at 604. When the Court declared a constitu-
tional right to homosexual sodomy, we were assured that
the case had nothing, nothing at all to do with "whether
the government must give formal recognition to any rela-
tionship that homosexual persons seek to enter." *Id.,* at
578. Now we are told that DOMA is invalid because it
"demeans the couple, whose moral and sexual choices the
Constitution protects," *ante,* at 23—with an accompanying
citation of *Lawrence.* It takes real cheek for today's major-
ity to assure us, as it is going out the door, that a constitu-
tional requirement to give formal recognition to same-sex
marriage is not at issue here—when what has preceded
that assurance is a lecture on how superior the majority's
moral judgment in favor of same-sex marriage is to the
Congress's hateful moral judgment against it. I promise
you this: The only thing that will "confine" the Court's
holding is its sense of what it can get away with.

I do not mean to suggest disagreement with THE CHIEF
JUSTICE's view, *ante,* p. 2–4 (dissenting opinion), that
lower federal courts and state courts can distinguish
today's case when the issue before them is state denial
of marital status to same-sex couples—or even that this
Court could *theoretically* do so. Lord, an opinion with such
scatter-shot rationales as this one (federalism noises
among them) can be distinguished in many ways. And
deserves to be. State and lower federal courts should take
the Court at its word and distinguish away.

In my opinion, however, the view that *this* Court will
take of state prohibition of same-sex marriage is indicated
beyond mistaking by today's opinion. As I have said, the
real rationale of today's opinion, whatever disappearing
trail of its legalistic argle-bargle one chooses to follow, is
that DOMA is motivated by "'bare . . . desire to harm'"

SCALIA, J., dissenting

couples in same-sex marriages. *Supra,* at 18. How easy it is, indeed how inevitable, to reach the same conclusion with regard to state laws denying same-sex couples marital status. Consider how easy (inevitable) it is to make the following substitutions in a passage from today's opinion *ante*, at 22:

> "~~DOMA's~~ *This state law's* principal effect is to identify a subset of ~~state-sanctioned marriages~~ *constitutionally protected sexual relationships,* see *Lawrence,* and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency. Responsibilities, as well as rights, enhance the dignity and integrity of the person. And ~~DOMA~~ *this state law* contrives to deprive some couples ~~married under the laws of their State~~ *enjoying constitutionally protected sexual relationships,* but not other couples, of both rights and responsibilities."

Or try this passage, from *ante,* at 22–23:

> "~~[DOMA]~~ *This state law* tells those couples, and all the world, that their otherwise valid ~~marriages~~ *relationships* are unworthy of ~~federal~~ *state* recognition. This places same-sex couples in an unstable position of being in a second-tier ~~marriage~~ *relationship*. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see *Lawrence,* . . . ."

Or this, from *ante,* at 23—which does not even require alteration, except as to the invented number:

> "And it humiliates ~~tens of~~ thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives."

24          UNITED STATES *v.* WINDSOR

Similarly transposable passages—deliberately transposable, I think—abound.  In sum, that Court which finds it so horrific that Congress irrationally and hatefully robbed same-sex couples of the "personhood and dignity" which state legislatures conferred upon them, will of a certitude be similarly appalled by state legislatures' irrational and hateful failure to acknowledge that "personhood and dignity" in the first place.  *Ante*, at 26.  As far as this Court is concerned, no one should be fooled; it is just a matter of listening and waiting for the other shoe.

By formally declaring anyone opposed to same-sex marriage an enemy of human decency, the majority arms well every challenger to a state law restricting marriage to its traditional definition.  Henceforth those challengers will lead with this Court's declaration that there is "no legitimate purpose" served by such a law, and will claim that the traditional definition has "the purpose and effect to disparage and to injure" the "personhood and dignity" of same-sex couples, see *ante*, at 25, 26.  The majority's limiting assurance will be meaningless in the face of language like that, as the majority well knows.  That is why the language is there.  The result will be a judicial distortion of our society's debate over marriage—a debate that can seem in need of our clumsy "help" only to a member of this institution.

As to that debate: Few public controversies touch an institution so central to the lives of so many, and few inspire such attendant passion by good people on all sides.  Few public controversies will ever demonstrate so vividly the beauty of what our Framers gave us, a gift the Court pawns today to buy its stolen moment in the spotlight: a system of government that permits us to rule *ourselves*.  Since DOMA's passage, citizens on all sides of the question have seen victories and they have seen defeats.  There have been plebiscites, legislation, persuasion, and loud voices—in other words, democracy.  Victories in one place

SCALIA, J., dissenting

for some, see North Carolina Const., Amdt. 1 (providing that "[m]arriage between one man and one woman is the only domestic legal union that shall be valid or recognized in this State") (approved by a popular vote, 61% to 39% on May 8, 2012),[6] are offset by victories in other places for others, see Maryland Question 6 (establishing "that Maryland's civil marriage laws allow gay and lesbian couples to obtain a civil marriage license") (approved by a popular vote, 52% to 48%, on November 6, 2012).[7] Even in a *single State*, the question has come out differently on different occasions. Compare Maine Question 1 (permitting "the State of Maine to issue marriage licenses to same-sex couples") (approved by a popular vote, 53% to 47%, on November 6, 2012)[8] with Maine Question 1 (rejecting "the new law that lets same-sex couples marry") (approved by a popular vote, 53% to 47%, on November 3, 2009).[9]

In the majority's telling, this story is black-and-white: Hate your neighbor or come along with us. The truth is more complicated. It is hard to admit that one's political opponents are not monsters, especially in a struggle like this one, and the challenge in the end proves more than today's Court can handle. Too bad. A reminder that disagreement over something so fundamental as marriage can still be politically legitimate would have been a fit task for what in earlier times was called the judicial temperament. We might have covered ourselves with honor today, by promising all sides of this debate that it was

_____

[6] North Carolina State Board of Elections, Official Results: Primary Election of May 8, 2012, Constitutional Amendment.

[7] Maryland State Board of Elections, Official 2012 Presidential General Election Results for All State Questions, Question 06.

[8] Maine Bureau of Elections, Nov. 3, 2009, Referendum Tabulation (Question 1).

[9] Maine Bureau of Elections, Nov. 6, 2012, Referendum Election Tabulations (Question 1).

26          UNITED STATES *v.* WINDSOR

Scalia, J., dissenting

theirs to settle and that we would respect their resolution.
We might have let the People decide.

But that the majority will not do.  Some will rejoice in
today's decision, and some will despair at it; that is the
nature of a controversy that matters so much to so many.
But the Court has cheated both sides, robbing the winners
of an honest victory, and the losers of the peace that
comes from a fair defeat.  We owed both of them better.
I dissent.

Cite as: 570 U. S. \_\_\_\_ (2013)          1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–307

_____

## UNITED STATES, PETITIONER v. EDITH SCHLAIN WINDSOR, IN HER CAPACITY AS EXECUTOR OF THE ESTATE OF THEA CLARA SPYER, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2013]

JUSTICE ALITO, with whom JUSTICE THOMAS joins as to Parts II and III, dissenting.

Our Nation is engaged in a heated debate about same-sex marriage. That debate is, at bottom, about the nature of the institution of marriage. Respondent Edith Windsor, supported by the United States, asks this Court to intervene in that debate, and although she couches her argument in different terms, what she seeks is a holding that enshrines in the Constitution a particular understanding of marriage under which the sex of the partners makes no difference. The Constitution, however, does not dictate that choice. It leaves the choice to the people, acting through their elected representatives at both the federal and state levels. I would therefore hold that Congress did not violate Windsor's constitutional rights by enacting §3 of the Defense of Marriage Act (DOMA), 110 Stat. 2419, which defines the meaning of marriage under federal statutes that either confer upon married persons certain federal benefits or impose upon them certain federal obligations.

I

I turn first to the question of standing. In my view, the

Alito, J., dissenting

United States clearly is not a proper petitioner in this case. The United States does not ask us to overturn the judgment of the court below or to alter that judgment in any way. Quite to the contrary, the United States argues emphatically in favor of the correctness of that judgment. We have never before reviewed a decision at the sole behest of a party that took such a position, and to do so would be to render an advisory opinion, in violation of Article III's dictates. For the reasons given in Justice Scalia's dissent, I do not find the Court's arguments to the contrary to be persuasive.

Whether the Bipartisan Legal Advisory Group of the House of Representatives (BLAG) has standing to petition is a much more difficult question. It is also a significantly closer question than whether the intervenors in *Hollingsworth* v. *Perry, ante,* p. ___—which the Court also decides today—have standing to appeal. It is remarkable that the Court has simultaneously decided that the United States, which "receive[d] all that [it] ha[d] sought" below, *Deposit Guaranty Nat. Bank* v. *Roper*, 445 U. S. 326, 333 (1980), is a proper petitioner in this case but that the intervenors in *Hollingsworth*, who represent the party that lost in the lower court, are not. In my view, both the *Hollingsworth* intervenors and BLAG have standing.[1]

───────────

[1] Our precedents make clear that, in order to support our jurisdiction, BLAG must demonstrate that it had Article III standing in its own right, quite apart from its status as an intervenor. See *Diamond* v. *Charles*, 476 U. S. 54, 68 (1986) ("Although intervenors are considered parties entitled, among other things, to seek review by this Court, an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III" (citation omitted)); *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64 (1997) ("Standing to defend on appeal in the place of an original defendant, no less than standing to sue, demands that the litigant possess a direct stake in the outcome" (internal quotation marks omitted)); *id.*,

A party invoking the Court's authority has a sufficient stake to permit it to appeal when it has "'suffered an injury in fact' that is caused by 'the conduct complained of' and that 'will be redressed by a favorable decision.'" *Camreta* v. *Greene*, 563 U. S. ___, ___ (2011) (slip op., at 5) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992)). In the present case, the House of Representatives, which has authorized BLAG to represent its interests in this matter,[2] suffered just such an injury.

In *INS* v. *Chadha*, 462 U. S. 919 (1983), the Court held that the two Houses of Congress were "proper parties" to file a petition in defense of the constitutionality of the one-house veto statute, *id.*, at 930, n. 5 (internal quotation marks omitted). Accordingly, the Court granted and decided petitions by both the Senate and the House, in addition to the Executive's petition. *Id.*, at 919, n.*. That the two Houses had standing to petition is not surprising: The Court of Appeals' decision in *Chadha*, by holding the one-house veto to be unconstitutional, had limited Congress' power to legislate. In discussing Article III standing, the Court suggested that Congress suffered a similar injury whenever federal legislation it had passed was struck down, noting that it had "long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional." *Id.*, at 940.

The United States attempts to distinguish *Chadha* on

―――――――

at 65 ("An intervenor cannot step into the shoes of the original party unless the intervenor independently fulfills the requirements of Article III" (internal quotation marks omitted)).

[2] H. Res. 5, 113th Cong., 1st Sess., §4(a)(1)(B) (2013) ("[BLAG] continues to speak for, and articulates the institutional position of, the House in all litigation matters in which it appears, including in Windsor v. United States").

the ground that it "involved an unusual statute that vested the House and the Senate themselves each with special procedural rights—namely, the right effectively to veto Executive action." Brief for United States (jurisdiction) 36. But that is a distinction without a difference: just as the Court of Appeals decision that the *Chadha* Court affirmed impaired Congress' power by striking down the one-house veto, so the Second Circuit's decision here impairs Congress' legislative power by striking down an Act of Congress. The United States has not explained why the fact that the impairment at issue in *Chadha* was "special" or "procedural" has any relevance to whether Congress suffered an injury. Indeed, because legislating is Congress' central function, any impairment of that function is a more grievous injury than the impairment of a procedural add-on.

The Court's decision in *Coleman* v. *Miller*, 307 U. S. 433 (1939), bolsters this conclusion. In *Coleman*, we held that a group of state senators had standing to challenge a lower court decision approving the procedures used to ratify an amendment to the Federal Constitution. We reasoned that the senators' votes—which would otherwise have carried the day—were nullified by that action. See *id.,* at 438 ("Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes"); *id.,* at 446 ("[W]e find no departure from principle in recognizing in the instant case that at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and

ALITO, J., dissenting

deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision"). By striking down §3 of DOMA as unconstitutional, the Second Circuit effectively "held for naught" an Act of Congress. Just as the state-senator-petitioners in *Coleman* were necessary parties to the amendment's ratification, the House of Representatives was a necessary party to DOMA's passage; indeed, the House's vote would have been sufficient to prevent DOMA's repeal if the Court had not chosen to execute that repeal judicially.

Both the United States and the Court-appointed *amicus* err in arguing that *Raines* v. *Byrd*, 521 U. S. 811 (1997), is to the contrary. In that case, the Court held that Members of Congress who had voted "nay" to the Line Item Veto Act did not have standing to challenge that statute in federal court. *Raines* is inapposite for two reasons. First, *Raines* dealt with individual Members of Congress and specifically pointed to the individual Members' lack of institutional endorsement as a sign of their standing problem: "We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id.*, at 829; see also *ibid.*, n. 10 (citing cases to the effect that "members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take" (internal quotation marks omitted)).

Second, the Members in *Raines*—unlike the state senators in *Coleman*—were not the pivotal figures whose votes would have caused the Act to fail absent some challenged action. Indeed, it is telling that *Raines* characterized *Coleman* as standing "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nulli-

ALITO, J., dissenting

fied." 521 U. S., at 823. Here, by contrast, passage by the House was needed for DOMA to become law. U. S. Const., Art. I, §7 (bicameralism and presentment requirements for legislation).

I appreciate the argument that the Constitution confers on the President alone the authority to defend federal law in litigation, but in my view, as I have explained, that argument is contrary to the Court's holding in *Chadha*, and it is certainly contrary to the *Chadha* Court's endorsement of the principle that "Congress is the proper party to defend the validity of a statute" when the Executive refuses to do so on constitutional grounds. 462 U. S., at 940. See also 2 U. S. C. §288h(7) (Senate Legal Counsel shall defend the constitutionality of Acts of Congress when placed in issue).[3] Accordingly, in the narrow category of cases in which a court strikes down an Act of Congress and the Executive declines to defend the Act, Congress both has standing to defend the undefended statute and is a proper party to do so.

## II

Windsor and the United States argue that §3 of DOMA violates the equal protection principles that the Court has found in the Fifth Amendment's Due Process Clause. See Brief for Respondent Windsor (merits) 17–62; Brief for United States (merits) 16–54; cf. *Bolling* v. *Sharpe*, 347 U. S. 497 (1954). The Court rests its holding on related arguments. See *ante*, at 24–25.

Same-sex marriage presents a highly emotional and important question of public policy—but not a difficult question of constitutional law. The Constitution does not

─────────

[3]*Buckley* v. *Valeo*, 424 U. S. 1 (1976), is not to the contrary. The Court's statements there concerned enforcement, not defense.

ALITO, J., dissenting

guarantee the right to enter into a same-sex marriage. Indeed, no provision of the Constitution speaks to the issue.

The Court has sometimes found the Due Process Clauses to have a substantive component that guarantees liberties beyond the absence of physical restraint. And the Court's holding that "DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution," *ante*, at 25, suggests that substantive due process may partially underlie the Court's decision today. But it is well established that any "substantive" component to the Due Process Clause protects only "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" *Washington* v. *Glucksberg*, 521 U. S. 702, 720–721 (1997); *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934) (referring to fundamental rights as those that are so "rooted in the traditions and conscience of our people as to be ranked as fundamental"), as well as "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg, supra*, at 721 (quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325–326 (1937)).

It is beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation's history and tradition. In this country, no State permitted same-sex marriage until the Massachusetts Supreme Judicial Court held in 2003 that limiting marriage to opposite-sex couples violated the State Constitution. See *Goodridge* v. *Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941. Nor is the right to same-sex marriage deeply rooted in the traditions of other nations. No country allowed same-sex couples to marry until the Netherlands did so in 2000.[4]

_____

[4] Curry-Sumner, A Patchwork of Partnerships: Comparative Over-

What Windsor and the United States seek, therefore, is not the protection of a deeply rooted right but the recognition of a very new right, and they seek this innovation not from a legislative body elected by the people, but from unelected judges.  Faced with such a request, judges have cause for both caution and humility.

The family is an ancient and universal human institution.  Family structure reflects the characteristics of a civilization, and changes in family structure and in the popular understanding of marriage and the family can have profound effects.  Past changes in the understanding of marriage—for example, the gradual ascendance of the idea that romantic love is a prerequisite to marriage—have had far-reaching consequences.  But the process by which such consequences come about is complex, involving the interaction of numerous factors, and tends to occur over an extended period of time.

We can expect something similar to take place if same-sex marriage becomes widely accepted.  The long-term consequences of this change are not now known and are unlikely to be ascertainable for some time to come.[5]  There are those who think that allowing same-sex marriage will seriously undermine the institution of marriage.  See, *e.g.,* S. Girgis, R. Anderson, & R. George, What is Marriage? Man and Woman: A Defense 53–58 (2012); Finnis, Marriage: A Basic and Exigent Good, 91 The Monist 388, 398

_____

view of Registration Schemes in Europe, in Legal Recognition of Same-Sex Partnerships 71, 72 (K. Boele-Woelki & A. Fuchs eds., rev. 2d ed., 2012).

[5]As sociologists have documented, it sometimes takes decades to document the effects of social changes—like the sharp rise in divorce rates following the advent of no-fault divorce—on children and society. See generally J. Wallerstein, J. Lewis, & S. Blakeslee, The Unexpected Legacy of Divorce: The 25 Year Landmark Study (2000).

ALITO, J., dissenting

(2008).[6]  Others think that recognition of same-sex marriage will fortify a now-shaky institution.  See, *e.g.,* A. Sullivan, Virtually Normal: An Argument About Homosexuality 202–203 (1996); J. Rauch, Gay Marriage: Why It Is Good for Gays, Good for Straights, and Good for America 94 (2004).

At present, no one—including social scientists, philosophers, and historians—can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be.  And judges are

———————

[6] Among those holding that position, some deplore and some applaud this predicted development.  Compare, *e.g.,* Wardle, "Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J. L. & Pub. Pol'y 771, 799 (2001) ("Culturally, the legalization of same-sex marriage would send a message that would undermine the social boundaries relating to marriage and family relations.  The confusion of social roles linked with marriage and parenting would be tremendous, and the message of 'anything goes' in the way of sexual behavior, procreation, and parenthood would wreak its greatest havoc among groups of vulnerable individuals who most need the encouragement of bright line laws and clear social mores concerning procreative responsibility") and Gallagher, (How) Will Gay Marriage Weaken Marriage as a Social Institution: A Reply to Andrew Koppelman, 2 U. St. Thomas L. J. 33, 58 (2005) ("If the idea of marriage really does matter—if society really does need a social institution that manages opposite-sex attractions in the interests of children and society—then taking an already weakened social institution, subjecting it to radical new redefinitions, and hoping that there are no consequences is probably neither a wise nor a compassionate idea"), with Brownworth, Something Borrowed, Something Blue: Is Marriage Right for Queers? in I Do/I Don't: Queers on Marriage 53, 58–59 (G. Wharton & I. Phillips eds. 2004) (Former President George W. "Bush is correct . . . when he states that allowing same-sex couples to marry will weaken the institution of marriage.  It most certainly will do so, and that will make marriage a far better concept than it previously has been") and Willis, Can Marriage Be Saved? A Forum, The Nation, p. 16 (2004) (celebrating the fact that "conferring the legitimacy of marriage on homosexual relations will introduce an implicit revolt against the institution into its very heart").

certainly not equipped to make such an assessment. The
Members of this Court have the authority and the respon-
sibility to interpret and apply the Constitution. Thus, if
the Constitution contained a provision guaranteeing the
right to marry a person of the same sex, it would be our
duty to enforce that right. But the Constitution simply
does not speak to the issue of same-sex marriage. In our
system of government, ultimate sovereignty rests with the
people, and the people have the right to control their own
destiny. Any change on a question so fundamental should
be made by the people through their elected officials.

### III

Perhaps because they cannot show that same-sex mar-
riage is a fundamental right under our Constitution,
Windsor and the United States couch their arguments in
equal protection terms. They argue that §3 of DOMA
discriminates on the basis of sexual orientation, that
classifications based on sexual orientation should trigger a
form of "heightened" scrutiny, and that §3 cannot survive
such scrutiny. They further maintain that the govern-
mental interests that §3 purports to serve are not suffi-
ciently important and that it has not been adequately
shown that §3 serves those interests very well. The
Court's holding, too, seems to rest on "the equal protection
guarantee of the Fourteenth Amendment," *ante,* at 25—
although the Court is careful not to adopt most of Wind-
sor's and the United States' argument.

In my view, the approach that Windsor and the United
States advocate is misguided. Our equal protection frame-
work, upon which Windsor and the United States rely,
is a judicial construct that provides a useful mechanism
for analyzing a certain universe of equal protection
cases. But that framework is ill suited for use in evaluat-
ing the constitutionality of laws based on the traditional
understanding of marriage, which fundamentally turn on

Cite as: 570 U. S. ____ (2013)          11

ALITO, J., dissenting

what marriage is.

Underlying our equal protection jurisprudence is the central notion that "[a] classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed* v. *Reed*, 404 U. S. 71, 76 (1971) (quoting *F. S. Royter Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920)). The modern tiers of scrutiny—on which Windsor and the United States rely so heavily—are a heuristic to help judges determine when classifications have that "fair and substantial relation to the object of the legislation." *Reed, supra,* at 76.

So, for example, those classifications subject to strict scrutiny—*i.e.,* classifications that must be "narrowly tailored" to achieve a "compelling" government interest, *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 720 (2007) (internal quotation marks omitted)—are those that are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440 (1985); cf. *id.*, at 452–453 (Stevens, J., concurring) ("It would be utterly irrational to limit the franchise on the basis of height or weight; it is equally invalid to limit it on the basis of skin color. None of these attributes has any bearing at all on the citizen's willingness or ability to exercise that civil right").

In contrast, those characteristics subject to so-called intermediate scrutiny—*i.e.,* those classifications that must be "'substantially related'" to the achievement of "important governmental objective[s]," *United States* v. *Virginia*, 518 U. S. 515, 524 (1996); *id.,* at 567 (SCALIA, J., dissenting)—are those that are *sometimes* relevant considerations to be taken into account by legislators, but "generally provid[e] no sensible ground for different treat-

ment," *Cleburne*, *supra*, at 440.  For example, the Court has held that statutory rape laws that criminalize sexual intercourse with a woman under the age of 18 years, but place no similar liability on partners of underage men, are grounded in the very real distinction that "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse." *Michael M.* v. *Superior Court, Sonoma Cty.*, 450 U. S. 464, 471 (1981) (plurality opnion).  The plurality reasoned that "[o]nly women may become pregnant, and they suffer disproportionately the profound physical, emotional, and psychological consequences of sexual activity." *Ibid.*  In other contexts, however, the Court has found that classifications based on gender are "arbitrary," *Reed*, *supra*, at 76, and based on "outmoded notions of the relative capabilities of men and women," *Cleburne*, *supra*, at 441, as when a State provides that a man must always be preferred to an equally qualified woman when both seek to administer the estate of a deceased party, see *Reed*, *supra*, at 76–77.

Finally, so-called rational-basis review applies to classifications based on "distinguishing characteristics relevant to interests the State has the authority to implement." *Cleburne*, *supra*, at 441.  We have long recognized that "the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantages to various groups or persons." *Romer* v. *Evans*, 517 U. S. 620, 631 (1996).  As a result, in rational-basis cases, where the court does not view the classification at issue as "inherently suspect," *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 218 (1995) (internal quotation marks omitted), "the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should

ALITO, J., dissenting

be pursued." *Cleburne*, *supra*, at 441–442.

In asking the Court to determine that §3 of DOMA is subject to and violates heightened scrutiny, Windsor and the United States thus ask us to rule that the presence of two members of the opposite sex is as rationally related to marriage as white skin is to voting or a Y-chromosome is to the ability to administer an estate. That is a striking request and one that unelected judges should pause before granting. Acceptance of the argument would cast all those who cling to traditional beliefs about the nature of marriage in the role of bigots or superstitious fools.

By asking the Court to strike down DOMA as not satisfying some form of heightened scrutiny, Windsor and the United States are really seeking to have the Court resolve a debate between two competing views of marriage.

The first and older view, which I will call the "traditional" or "conjugal" view, sees marriage as an intrinsically opposite-sex institution. BLAG notes that virtually every culture, including many not influenced by the Abrahamic religions, has limited marriage to people of the opposite sex. Brief for Respondent BLAG (merits) 2 (citing *Hernandez* v. *Robles*, 7 N. Y. 3d 338, 361, 855 N. E. 2d 1, 8 (2006) ("Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex")). And BLAG attempts to explain this phenomenon by arguing that the institution of marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing. Brief for Respondent BLAG 44–46, 49. Others explain the basis for the institution in more philosophical terms. They argue that marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so. See, *e.g.*, Girgis, Anderson, & George, What is Marriage? Man and Woman:

ALITO, J., dissenting

A Defense, at 23–28. While modern cultural changes have weakened the link between marriage and procreation in the popular mind, there is no doubt that, throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship.

The other, newer view is what I will call the "consent-based" vision of marriage, a vision that primarily defines marriage as the solemnization of mutual commitment—marked by strong emotional attachment and sexual attraction—between two persons. At least as it applies to heterosexual couples, this view of marriage now plays a very prominent role in the popular understanding of the institution. Indeed, our popular culture is infused with this understanding of marriage. Proponents of same-sex marriage argue that because gender differentiation is not relevant to this vision, the exclusion of same-sex couples from the institution of marriage is rank discrimination.

The Constitution does not codify either of these views of marriage (although I suspect it would have been hard at the time of the adoption of the Constitution or the Fifth Amendment to find Americans who did not take the traditional view for granted). The silence of the Constitution on this question should be enough to end the matter as far as the judiciary is concerned. Yet, Windsor and the United States implicitly ask us to endorse the consent-based view of marriage and to reject the traditional view, thereby arrogating to ourselves the power to decide a question that philosophers, historians, social scientists, and theologians are better qualified to explore.[7] Because our consti-

---

[7]The degree to which this question is intractable to typical judicial processes of decisionmaking was highlighted by the trial in *Hollingsworth* v. *Perry*, *ante*, p. ___. In that case, the trial judge, after

Cite as: 570 U. S. ____ (2013)        15

ALITO, J., dissenting

tutional order assigns the resolution of questions of this nature to the people, I would not presume to enshrine either vision of marriage in our constitutional jurisprudence.

——————

receiving testimony from some expert witnesses, purported to make "findings of fact" on such questions as why marriage came to be, *Perry* v. *Schwarzenegger,* 704 F. Supp. 2d 921, 958 (ND Cal. 2010) (finding of fact no. 27) ("Marriage between a man and a woman was traditionally organized based on presumptions of division of labor along gender lines. Men were seen as suited for certain types of work and women for others. Women were seen as suited to raise children and men were seen as suited to provide for the family"), what marriage is, *id.*, at 961 (finding of fact no. 34) ("Marriage is the state recognition and approval of a couple's choice to live with each other, to remain committed to one another and to form a household based on their own feelings about one another and to join in an economic partnership and support one another and any dependents"), and the effect legalizing same-sex marriage would have on opposite-sex marriage, *id.*, at 972 (finding of fact no. 55) ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages").

At times, the trial reached the heights of parody, as when the trial judge questioned his ability to take into account the views of great thinkers of the past because they were unavailable to testify in person in his courtroom. See 13 Tr. in No. C 09–2292 VRW (ND Cal.), pp. 3038–3039.

And, if this spectacle were not enough, some professors of constitutional law have argued that we are bound to accept the trial judge's findings—including those on major philosophical questions and predictions about the future—unless they are "clearly erroneous." See Brief for Constitutional Law and Civil Procedure Professors as *Amici Curiae* in *Hollingsworth* v. *Perry,* O. T. 2012, No. 12–144, pp. 2–3 ("[T]he district court's factual findings are compelling and should be given significant weight"); *id.*, at 25 ("Under any standard of review, this Court should credit and adopt the trial court's findings because they result from rigorous and exacting application of the Federal Rules of Evidence, and are supported by reliable research and by the unanimous consensus of mainstream social science experts"). Only an arrogant legal culture that has lost all appreciation of its own limitations could take such a suggestion seriously.

ALITO, J., dissenting

Legislatures, however, have little choice but to decide between the two views. We have long made clear that neither the political branches of the Federal Government nor state governments are required to be neutral between competing visions of the good, provided that the vision of the good that they adopt is not countermanded by the Constitution. See, *e.g., Rust* v. *Sullivan*, 500 U. S. 173, 192 (1991) ("[T]he government 'may make a value judgment favoring childbirth over abortion'" (quoting *Maher* v. *Rue*, 432 U. S. 464, 474 (1977))). Accordingly, both Congress and the States are entitled to enact laws recognizing either of the two understandings of marriage. And given the size of government and the degree to which it now regulates daily life, it seems unlikely that either Congress or the States could maintain complete neutrality even if they tried assiduously to do so.

Rather than fully embracing the arguments made by Windsor and the United States, the Court strikes down §3 of DOMA as a classification not properly supported by its objectives. The Court reaches this conclusion in part because it believes that §3 encroaches upon the States' sovereign prerogative to define marriage. See *ante,* at 21–22 ("As the title and dynamics of the bill indicate, its purpose is to discourage enactment of state same-sex marriage laws and to restrict the freedom and choice of couples married under those laws if they are enacted. The congressional goal was 'to put a thumb on the scales and influence a state's decision as to how to shape its own marriage laws'" (quoting *Massachusetts* v. *United States Dept. of Health and Human Servs.*, 682 F. 3d 1, 12–13 (CA1 2012))). Indeed, the Court's ultimate conclusion is that DOMA falls afoul of the Fifth Amendment because it "singles out a class of persons deemed *by a State* entitled to recognition and protection to enhance their own liberty" and "imposes a disability on the class by refusing to acknowledge a status *the State finds* to be dignified and

ALITO, J., dissenting

proper." *Ante*, at 25 (emphasis added).

To the extent that the Court takes the position that the question of same-sex marriage should be resolved primarily at the state level, I wholeheartedly agree. I hope that the Court will ultimately permit the people of each State to decide this question for themselves. Unless the Court is willing to allow this to occur, the whiffs of federalism in the today's opinion of the Court will soon be scattered to the wind.

In any event, §3 of DOMA, in my view, does not encroach on the prerogatives of the States, assuming of course that the many federal statutes affected by DOMA have not already done so. Section 3 does not prevent any State from recognizing same-sex marriage or from extending to same-sex couples any right, privilege, benefit, or obligation stemming from state law. All that §3 does is to define a class of persons to whom federal law extends certain special benefits and upon whom federal law imposes certain special burdens. In these provisions, Congress used marital status as a way of defining this class—in part, I assume, because it viewed marriage as a valuable institution to be fostered and in part because it viewed married couples as comprising a unique type of economic unit that merits special regulatory treatment. Assuming that Congress has the power under the Constitution to enact the laws affected by §3, Congress has the power to define the category of persons to whom those laws apply.

\*   \*   \*

For these reasons, I would hold that §3 of DOMA does not violate the Fifth Amendment. I respectfully dissent.